EDWIN ARTHUR HALL, Respondent, Appellant, *v.* BINGHAMTON PRESS COMPANY and TOM R. HUTTON, Appellants, Respondents.

Third Department, March 4, 1942.

406

408

*Paul T. Gorman,* for the plaintiff.

*Hinman, Howard & Kattell* [*George L. Hinman* of counsel], for the defendants.

HILL, P. J.   Each of these articles was published in February, 1941, immediately following the passage of the lease-lend bill by a narrow margin in the House of Representatives, and more than ten months before the United States took its place with the united nations in a declaration of war against the aggressor group.

The open letter criticized plaintiff, Congressman from the Thirty-fourth New York District, for his vote against the lease-lend bill as being in opposition to the sentiment of the people of his district and as indicating that he was opposed to defense measures, and propounded this inquiry: " So it seems in order to ask you at this juncture whether you do feel that this country should be defended against un-Americanisms or whether you are going to take the line of least resistance and wind up with the Quislings."

It also repeated the generally accepted belief that the dictators received comfort and assurance from dissension in America concerning preparation for defense and war. It recited the contest between Congress and the Administration, and expressed a belief that if America was to take a strong, united stand the aggressor nations would pause before inviting a declaration of war, and admonished plaintiff that he should not " permit any word or act " to indicate that the nation would not take all steps for defense, and continued: " That, to our notion, Mr. Congressman, is the most grievous thing about your vote on the lease-lend bill. You have not represented the views of your people." It also, with piquancy and mild vulgarity, discussed plaintiff's youth, telling him that he is " hardly dry behind the ears " as Congressmen go, and that the writer thought " the younger generation is softening and sometimes we think the softening is not necessarily in the muscles." This is the only reference to plaintiff personally as distinguished from his votes in Congress and his political beliefs. Language of this kind is discussed in the opinion in *Briarcliff L. Hotel* v. *C.-S. Publishers* (260 N. Y. 106), at page 118: " Mere exaggeration, slight irony or wit, or all those delightful touches of style which go to make an article readable, do not push beyond the limitations of fair comment. Facts do not cease to be facts because they are mixed with the fair and expectant comment of the story teller, who adds to the recital a little touch of his piquant pen."

The editorials discussed the ideology of Hitler, as expressed in " Mein Kampf," that " divided counsels of democracy offer an open invitation to the totalitarian will," asserted that Chamberlain's appeasement policy " was duck soup " for the plans of the aggressors, and attributed the fate of France, Norway, Netherlands and Belgium and other nations to lack of solidarity and preparation. As to plaintiff's attitude, it was asked whether he was the representative of the people of the district, or " of a small minority of weak-kneed, jelly-backed, slab-sided, half-baked, parasitical, long-haired mugwumps who are merely using this country for the purpose of making a living and have no intention of defending its ideals? " It recommended that the plaintiff's promises be put in writing, to assure that he would vote in accordance with the sentiment of the majority of his constituents. Nothing about this is libelous. It is not disgraceful or odious for a Congressman to vote against the wishes of the majority of his constituents if he honestly believes his position to be right. Edmund Burke is credited with saying in substance, in some one of his great speeches in Parliament that he owed his constituents more than servile

obedience to the sentiments of the majority, often reached without sufficient study and understanding. That in order properly to represent them, he was required to examine the question on his and their behalf, and honestly and fearlessly vote as he believed right, irrespective of the will of the majority.

These editorials were written when public sentiment was sharply divided, one group believing that the welfare, even the safety of our nation, required that " all out aid " be given Britain and her allies; the other advocating and urging the doctrine of isolationism. This divergence cut across party lines, with the discussion vigorous and bitter, the advocates on each side asserting that national safety and individual liberty depended upon the adoption of the theory which they advanced. During this controversy our First Citizen likened a national idol to Vallandingham, who was tried by a military commission in 1863 for disloyal utterances, found guilty and sentenced to confinement during the war, President Lincoln commuting the sentence to banishment beyond the Federal lines. In times like those through which we have recently passed, the doctrine of fair comment should be extended as far as the authorities will permit. With unprecedented social and governmental conditions, our own institutions threatened, national legislators who participate in the formation of governmental policies should be held to the strictest official accountability. History has shown that this is promoted through free exercise of the right to criticize official acts. The people furnish the legislators with an extensive and expensive secretariat, give them the right to use the mails at public expense. Their colleagues are generous in granting leave to print. With these opportunities for personal praise and propaganda, opposition newspapers and editorial writers should not be limited to weak, tepid and supine criticism and discussion.

In the portion of the complaint devoted to innuendo, it is stated that the editorial charges that plaintiff " was motivated by greed rather than patriotism in such vote." The meaning of the editorial is not enlarged by pleading innuendo. (*Hays* v. *American Defense Society*, 252 N. Y. 266, 270; *Gardner* v. *Home Life Publications, Inc.*, 237 App. Div. 200.) Plaintiff complains concerning the statement in the third editorial that Hitler pointed out in his book " that democracies may be thrown into confusion because of their very processes; that the people have to depend on selfish politicians, weak politicians, fearful politicians and greedy politicians to express their will; that in consequence the will is often not expressed (*sic* Mr. Hall's vote)." Assuming that therefrom it may be implied that one of these adjectives was applied as descriptive of

the offending vote, and that plaintiff was charged with "greed" in connection therewith; there is greed other than that which advances personal fortune referred to in the complaint — greed for office, praise, popularity, fame or other baubles, which would not lay one open to contempt or disgrace, or be actionable. Those emotions, like vanity, are harmless vices.

"All the facts alleged in the complaint or which can by reasonable and fair intendment be implied from the allegations thereof, are deemed admitted." (*Triggs* v. *Sun Printing & Publishing Assn.*, 179 N. Y. 144, 153.) Language which tends to expose one to contempt and ridicule, or to induce an evil opinion in the minds of right-thinking persons and to deprive one of their confidence, friendly intercourse and society, is libelous *per se.* (*Sydney* v. *Macfadden Newspaper Pub. Corp.*, 242 N. Y. 208; *Kimmerle* v. *New York Evening Journal, Inc.*, 262 id. 99.) The plaintiff's vote on these most vital questions was a matter about which a paper might make fair comment, either in its news items or editorially.

"A comment is fair when it is based on facts truly stated and free from imputations of corrupt or dishonorable motives on the part of the person whose conduct is criticised, and is an honest expression of the writer's real opinion or belief." (*Briarcliff L. Hotel* v. *C.-S. Publishers, supra,* 118.) It was not charged in the editorial that plaintiff was like Quisling. Inquiry was made whether plaintiff, by his votes in Congress indicated a belief that America should be defended or whether he was "going to take the line of least resistance and wind up with the Quislings."

Criticism as to matters of public interest and concern is privileged so long as the criticism is fair with an honest purpose and not intemperate and malicious. The protecting privilege is not lost because the discussion brings embarrassment to the official. These editorials doubtless advanced plaintiff's standing in the minds of those who believed in national isolation, and while he was condemned by those who believed in preparation for war and that defense was furthered by aid given Britain and her allies, this was caused by his vote in Congress against the lease-lend bill and not through reading the editorials.

The order should be reversed on the law, with costs, and the motion granted, with costs.

BLISS and HEFFERNAN, JJ., concur; BLISS, J., in a separate opinion, in which HILL, P. J., and HEFFERNAN, J., concur; FOSTER, J., dissents in an opinion, in which SCHENCK, J., concurs.

BLISS, J. (concurring). Ours is a representative government and one who assumes to represent our citizens in a legislative hall

must expect that his acts will be commented upon and criticized. When the safety of the nation is at stake strong men do not mince matters and neither the citizen nor his representative can be squeamish about it. Freedom of speech and press are guaranteed to us in our form of government and it is the right of the free press to criticise severely and of a free citizenry to speak plainly to and of its representatives. If they believe that the acts of such representatives are opposed to the national interest it is not only their privilege but their duty to say so. The most searching analysis may be and indeed must be made of such acts. If they are un-American and not in accord with the views of the nation as a whole, then they are opposed to its best interests. In the earlier days of our national existence these editorials would have been considered mild. If the press or our citizens honestly believe that the acts of a legislative representative lend comfort to our nation's enemies there must be no question about the right to tell him just that in no uncertain terms. Queasy words will not do. How else can a democracy function? If the citizens believe such acts may be setting up a government of Quislings, they must have the right to say so. It is one of the verities of democracy that eternal vigilance is the price of liberty. The courts may not muzzle those who maintain such vigilance. Great issues require strong language. If a legislator's vote cannot be criticized as being opposed to the national interest, then there is no field of fair comment.

In this light the editorials were but fair comment and criticism of a public official. The editorials themselves are wholly free from any imputation of corrupt or dishonorable motives and none of them accuse the plaintiff of being personally corrupt or dishonest. To tell a representative that he has voted against the best interest of his country or in the interest of some other nation or its leader, does not impute personal dishonesty to such legislator. It does seriously question the effect of his vote and his ability as a representative but does not charge him with personal dishonesty. I find nothing in these editorials which even intimates that the plaintiff voted after consultation with our country's enemies. It was said that his vote was not reached after consultation with the Americans of his district, thus inferring that it did not represent the true American feeling in his district. But that again is not a charge of dishonesty. I fail to find lurking in the third editorial the hidden meaning that the plaintiff imagines is there. To tell a Congressman that his vote was that of a greedy politician or of one who has placed greed above the public welfare does not accuse him of personal corruption or dishonesty. Greediness does not

imply dishonesty. These editorials do not impugn the integrity of the plaintiff, nor do they say he was not voting from honest conviction. They do tell, however, the direction in which such votes are leading and what will be their effect upon our national policy. All of which may be said with propriety.

I, therefore, vote to reverse the order in so far as appealed from by the defendants and to dismiss the complaint for the reasons above given, as well as for the reasons assigned by Presiding Justice Hill.

HILL, P. J., and HEFFERNAN, J., concur.

FOSTER, J. (dissenting). This is an action for libel. Plaintiff charges in three separate causes of action that defendants published three editorials concerning his conduct as a Member of Congress that were libelous. On a motion to dismiss the complaint for insufficiency the court at Special Term dismissed the last two causes alleged, which were based on the second and third editorials, and sustained the complaint as to the first cause of action, which was based on the first editorial. Both sides have appealed in part from the order entered on this decision.

The subject-matter of the articles complained of was plaintiff's attitude toward and his vote against a measure of legislation commonly called the lend-lease bill. The facts concerning this legislation and its purposes were common knowledge and of great public concern. It is now a matter of historic knowledge, known to every fairly well-informed person, that the proponents of this measure urged its adoption on the ground that, in the face of a totalitarian threat to all democracies, it would be for the best defensive interests of the United States to lend all possible aid to Great Britain and those other countries which were opposed to the Axis powers. Many of its opponents took the contrary view that the material aid which it was proposed to divert to Great Britain and her allies should be kept here to build a greater defensive armament for the defense of the United States in case we were attacked. It is obvious that on a momentous issue of public policy such as this, men, equally sincere and patriotic, and free from corrupt or dishonorable motives, might well take divergent views, especially in the light of events then known and the information then available. I advert to these matters of general knowledge merely because of the fact that the editorials in question voice the view that no one who had the best interests of the United States at heart would oppose the measure.

As a Member of Congress plaintiff's attitude and conduct on this legislation were fair subjects for public comment and criticism

(*Hamilton* v. *Eno*, 81 N. Y. 116.) In the case of a public official such comment is a qualified privilege subject to these limitations:

(1) The facts must be truly stated;

(2) The comment must be fair; that is, it must be such an inference as a fair-minded person would be warranted in drawing from truly stated facts; and it must not attribute evil or dishonorable motives unless such motives are inferences to be fairly drawn from the facts. (*Hoeppner* v. *Dunkirk Printing Co.*, 254 N. Y. 95; *Foley* v. *Press Publishing Co.*, 226 App. Div. 535; *Bingham* v. *Gaynor*, 203 N. Y. 27);

(3) It must not be motivated by malice, otherwise the privilege is lost. (*Cooper* v. *Stone*, 24 Wend. 434; *Hart* v. *Townsend*, 67 How. Pr. 88; *Triggs* v. *Sun Printing & Publishing Assn.*, 179 N. Y. 144.)

It has been said authoritatively: " A comment is fair when it is based on facts truly stated and free from imputations of corrupt or dishonorable motives on the part of the person whose conduct is criticized, and is an honest expression of the writer's real opinion or belief." (*Briarcliff L. Hotel* v. *C.-S. Publishers*, 260 N. Y. 106.) If the words used do not constitute a naked libel but may have a defamatory and libelous meaning, omitting any enlargement by way of innuendo, when such construction is placed upon them as would be naturally adopted by the average reader, then it is for a jury to say whether or not the publication was so understood, and if it is a question upon which reasonable men might differ it is for a jury to say which viewpoint is to be taken. (*Hays* v. *American Defense Society*, 252 N. Y. 266; *Hoeppner* v. *Dunkirk Printing Co.*, *supra; Hoey* v. *New York Times Co.*, 138 App. Div. 149; *O'Connell* v. *Press Publishing Co.*, 214 N. Y. 352; *Morrison* v. *Smith*, 177 id. 366.) In the case last cited it was said (p. 369): " If they [the words employed] are capable of such a meaning, however improbable it may appear, the jury should say whether they may be so understood."

The question then which we have to determine is whether the natural import of these articles or any of them would be considered libelous by the average reader. To determine this question it is not necessary in my judgment to quote the editorials in full. I fully appreciate the rule that ordinarily the entire article or articles are to be considered as a whole, but in this particular case the portions which I quote are neither enlarged or diminished in meaning or effect by the portions omitted. The first editorial contained these statements: " Sometimes we think that the younger generation is softening and sometimes we think the softening is not necessarily in the muscles. Of course, you realize that by this vote you

have raised a question about your attitude on national defense and so it seems in order to ask you at this juncture whether you do feel that this country should be defended against un-Americanisms or whether you are going to take the line of least resistance and wind up with the Quislings."

In my opinion this cannot be held as a matter of law to be merely fair comment on plaintiff's vote or its effect. It assumed, as its language indicates, that any one who opposed the lend-lease bill was also opposed to national defense, an assumption of fact quite unwarranted, and to the average reader it might well convey the imputation that plaintiff's attitude was dishonorable and contrary to his sworn duty as a representative of the people.

The second editorial contained these passages:

" The figures on the canvass of public opinion were not in yesterday when we suggested a referendum. If they had been, we wouldn't have suggested it, because that cross section was taken from the rank and file, with a careful detouring of all well-recognized propagandists and leaders on aid to Britain. In short, Mr. Hall had about the best break he could hope to get, the advantage of every doubt, and yet the score was something like 10-1 against him — against his vote — against his decision, which was obviously not reached as a result of any consultation with the Americans in the 34th Congressional District. * * *

" First, we think Mr. Hall should promise in writing that he will vote on matters of national defense in accordance with the best interests of the United States, and not in accordance with the best interests of the 5th columnists who represent Hitler, Benito Mussolini, the Japanese and Joe Stalin in this country. * * *

" Generally speaking, the newspapers of this area didn't support Mr. Roosevelt in the recent campaign. They aren't supporting him now necessarily. THEY ARE SUPPORTING THE DEFENSE OF THE UNITED STATES OF AMERICA. So are the people of the 34th Congressional District. That's what they want Mr. Hall to do as their representative in Congress. And they have the right to expect it. * * *

" Mr. Hall signs all his letters ' Your Congressman.'

" Well, whose? Whose congressman?

" Is he the representative of the people of the 34th Congressional District? Or is he the representative of a small minority of weak-kneed, jelly-backed, slab-sided, half-baked, parasitical long-haired mugwumps who are merely using this country for the purpose of making a living and have no intention of defending its ideals? Offhand, we think Mr. Hall had better explain pretty doggone fast."

This language I think is, at least, capable of a construction which passes the bounds of fair comment. The average reader might well be led to draw the defamatory conclusions from these words that plaintiff had arrived at his decision to vote as he did not by consultation with the citizens of his country but with those who are opposed to its defense, and that he voted in the interests of the fifth columnists, so called, and presumably the enemies of his country.

The third editorial had this to say: " In his book, ' Mein Kampf,' which amounted to blueprint and specification of how he intended to smash democracy, Adolf Hitler pointed out that the processes and the divided counsels of democracy offer an open invitation to the totalitarian will. He pointed out that democracies may be thrown into confusion because of their very processes; that the people have to depend on selfish politicians, weak politicians, fearful politicians and greedy politicians to express their will; that in consequence the will is often not expressed (sic Mr. Hall's vote)." I also believe that this language presents a question for a jury to pass upon. It seems to me the average reader could draw the conclusion from these words that plaintiff had classified himself by his attitude and vote as a greedy politician and one who placed greed above the welfare of his country. To a man in plaintiff's position such a charge carries the imputation of dishonorable conduct and amounts to defamation.

We are here concerned not with the probability of plaintiff's success upon a trial but merely to determine whether he has stated valid causes of action. I take it that we are required to apply the same rule to this complaint as we would to a complaint in any other action, that is to say, every reasonable intendment must be drawn in favor of the pleader. If the articles are at all ambiguous and susceptible of a libelous meaning then whether or not they would be understood in a libelous sense must necessarily be a question for a jury to determine. Indeed, as has already been pointed out, if they are capable of such a meaning, however improbable it may appear, a jury should be permitted to say whether they may be so understood. (*Morrison* v. *Smith, supra.*) The complaint very fully alleges the libelous inferences which an average reader could draw from each of the articles in question. Also it must not be overlooked that plaintiff has pleaded express malice on the part of the defendants. Unless we can say as a matter of law that the articles are not susceptible of any libelous meaning whatever, we must, for the purposes of this appeal, accept the allegation of malice as true. Malice, as heretofore pointed out, destroys the protection of what would otherwise be a qualified

privilege. While it is my opinion that the articles are not libelous *per se*, it is also my view that they are susceptible to a libelous meaning, and hence that plaintiff is entitled to have them submitted to a jury.

The order appealed from in so far as it dismisses the second and third causes of action alleged in the complaint should be reversed, with costs; otherwise, the order should be affirmed.

SCHENCK, J., concurs.

Order* reversed on the law, with fifty dollars costs and disbursements.

Motion to dismiss complaint granted, with costs.

* In so far as appealed from by defendants.—[REP.