## BERG v. PRINTERS' INK PUB. CO., Inc.

District Court, S. D. New York.
July 14, 1943.

Bondy & Schloss, of New York City, (Norman Winer, of New York City, of counsel), for plaintiff.

Isaac W. Digges, of New York City (Gilbert H. Weil, of New York City, of counsel), for defendant.

BRIGHT, District Judge.

Defendant moves to dismiss the complaint in this action brought against a publisher to recover damages for an alleged libel claimed to exist in an article entitled "Dusting Off Dr. Berg", written by Max Wylie of the Radio Department of N. W. Ayer & Son, Inc.

All of the facts alleged in the complaint, or which can by reasonable and fair intendment be implied from the allegations thereof, are deemed admitted (Triggs v. Sun Printing & Pub. Ass'n, 179 N.Y. 144–153, 71 N.E. 739, 66 L.R.A. 612, 103 Am.St.Rep. 841, 1 Ann.Cas. 326), except innuendos of which the challenged article is not susceptible. Naylor v. Variety Inc., 180 App.Div. 763–765, 167 N.Y.S. 772; Hall v. Binghamton Press Co., 263 App. Div. 403–411, 33 N.Y.S.2d 840. It is not the purpose of innuendo to graft a meaning upon or to enlarge the matter set forth, but merely to explain the application of the words used; and it must not put upon the words used a construction broader than they will bear. Huntly v. Empire Engineering Corp., 2 Cir., 211 F. 959–963; Hills v. Press Co., 122 Misc. 212, 202 N.Y. S. 678, affirmed without opinion 214 App. Div. 752, 209 N.Y.S. 848; O'Connell v. Press Pub. Co., 214 N.Y. 352–360, 108 N.E. 556; Cafferty v. Southern Tier Pub. Co., 226 N.Y. 87–91, 123 N.E. 76; Hays v. American Defense Soc., 252 N.Y. 266, 169 N.E. 380.

No special damages are alleged. The complaint, therefore, can be maintained only by establishing that the accused article is libelous per se. Keller v. Loyless, 2 Cir., 205 F. 510; McNamara v. Goldan, 194 N.Y. 315–321, 87 N.E. 440; Sydney v. MacFadden Newspaper Pub. Corp., 242 N.Y. 208–211, 151 N.E. 209, 44 A.L.R. 1419. To be libelous per se it must tend to expose plaintiff to public contempt, obloquy, scorn, aversion, ridicule, hatred, shame or disgrace, or to induce an evil opinion of him in the minds of right thinking persons, and to deprive him of their friendly intercourse in society. Sweeney v. Schenectady Union Pub. Co., 2 Cir., 122 F.2d 288–290, affirmed 316 U.S. 642, 62 S.Ct. 1031, 86 L.Ed. 1727; Triggs v. Sun Printing & Pub. Co., supra; Sydney v. MacFadden, supra.

The complaint alleges that for many years prior to the publication of the article in question, plaintiff was a physician specializing in neurology and psychiatry, of good name and repute widely known in his profession, and as a teacher and public servant, and was an author of books, pamphlets and articles, and known as an authority in his field. The published article is a criticism of two papers written by plaintiff, publicized in newspapers and otherwise, the first entitled "Preliminary Report: A Study of Certain Radio Programs and Their Effects Upon the Audience, Especially Adolescents and Women at the Climacterium"; and the second, "Radio and Civilian Morale".

When the plaintiff thus submitted his professional work to the public and

thereby appealed for its support and approval, he was bound to expect, with equal equanimity, praise or blame directed at the work itself. Fair and legitimate criticism is always permitted upon any work to which the attention of the public has been invited. It would not be a libel upon the plaintiff to say that the product of his pen was not good. Whatever is written cannot be said to be libelous except something which decreases or lowers plaintiff in his professional character. Outcault v. New York Herald, 117 App.Div. 534-537, 102 N.Y.S. 685. Merely to disagree, or to state that a claim is rejected would not be libelous. Cook v. Mirsky, 252 App.Div. 496, 299 N.Y.S. 912, affirmed without opinion 278 N.Y. 524, 15 N.E.2d 676. Criticism of so much of another's activities as are matters of public concern is fair, if the criticism, even though defamatory, is based on facts truly stated, free from imputations of corrupt or dishonest motives on the part of the person whose work is criticized, is an honest expression or the writer's real opinion or belief, and is not made solely for the purpose of causing hurt to the other. Mere exaggeration, slight irony or wit, and all those delightful touches of style which go to make an article readable, do not push beyond the limits of fair comment. Facts do not cease to be facts because they are mixed with the fair and expected comment of the story teller who adds to the recital a little touch of his piquant pen. Briarcliff Lodge Hotel v. Citizens-Sentinel Publishers, Inc., 260 N.Y. 106-118, 183 N.E. 193. Restatement of the Law of Torts, § 606. The criticism need not express an opinion with which any person of reasonable intelligence and judgment could possibly agree. Unlike a personal attack upon a public man, the fact that the comment or criticism is one which is not reasonably warranted by the facts upon which it is based or is fantastic or extravagant, is immaterial. If the public is to be aided in forming its judgment upon matters of public interest by a free interchange of opinion, it is essential that honest criticism and comment, no matter how foolish or prejudiced, be privileged. It must not constitute an attack upon the author except in respect to the worth of his work. Restatement, § 606(c); 609(b); § 610. Published work is of public interest and fair criticism or comment on such matters is not actionable in the absence of bad faith or a bad motive. Such criticism usually implies some criticism of the author; and though his private character is no more subject to attack than another's, the qualities which he has shown by what he has published are open to such analysis and comment as an honest and intelligent man might make. Restatement, § 606(e); § 609(c); Potts v. Dies, 77 U.S. App. D. C. 92, 132 F.2d 734; Sullivan v. Meyer, 67 App. D. C. 228, 91 F.2d 301-302. Judge Learned Hand has succinctly stated it—"It is indeed not true that all ridicule * * * or all disagreeable comment * * * is actionable; a man must not be too thin-skinned or a self-important prig * * *." It must "expose the plaintiff to more than trivial ridicule." Burton v. Crowell Pub. Co., 2 Cir., 82 F.2d 154, 155.

Of course, "while every one has a right to comment on matters of public interest, so long as one does so fairly, with an honest purpose, and not intemperately and maliciously, although the publication is made to the general public by means of a newspaper, yet what is privileged is criticism, not other defamatory statements; and, if a person takes upon himself to allege matters otherwise actionable, he will not be privileged, however honest his motives, if those allegations are not true. * * * The single purpose of the rule permitting fair and honest criticism is that it promotes the public good, enables the people to discern right from wrong, encourages merit, and firmly condemns and exposes the charlatan and the cheat, and hence is based upon public policy. The distinction between criticism and defamation is that criticism deals only with such things as invite public attention or call for public comment, and does not follow a public man into his private life, or pry into his domestic concerns. It never attacks the individual, but only his work. A true critic never indulges in personalities, but confines himself to the merits of the subject-matter, and never takes advantage of the occasion to obtain any other object beyond a fair discussion of matters of public interest, and the judicious guidance of the public taste." Triggs v. Sun Printing & Pub. Ass'n, 179 N.Y. 144-154, 71 N.E. 739, 742, 66 L.R.A. 612, 103 Am.St.Rep. 841, 1 Ann.Cas. 326. Any honest comment or criticism of the plaintiff's ability in his activities of public concern is not libelous. If the facts be truly stated, an opinion of his capacity drawn from these facts, if it be fair and honest, may be given without fear of a damage suit. A criticism or comment upon facts correctly stated, even if they reflect

against the ability of the plaintiff and upon him personally, would not be libelous. Hoeppner v. Dunkirk Printing Co., 254 N.Y. 95-106, 172 N.E. 139, 72 A.L.R. 913.

▇▇▇▇ Language is not in and of itself libelous unless the language as a whole, considered in its ordinary meaning, naturally and proximately is so injurious to the plaintiff that the court will presume, without any proof, that his reputation has been impaired. O'Connell v. Press Pub. Co., 214 N.Y. 352-358, 108 N.E. 556. The right of criticism of a public character must be taken into account when the court is called upon to determine, as a matter of law, whether an article is libelous per se. Duffy v. New York Evening Post Co., 109 App. Div. 471-475, 96 N.E. 629. The libel law is not a system of technicalities, but reasonable regulations whereby the public may be furnished news and information but not false stories about anyone. When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal hurt has been done. Cafferty v. Southern Tier Pub. Co., 226 N.Y. 87-93, 123 N.E. 76. The courts will not be astute to discover fine distinctions in words nor scholastic differentiations in phrases, so long as they are sufficiently in touch with affairs to understand the meaning which the man on the street attributes to ordinary every day English. Vitagraph Co. v. Ford, D. C., 241 F. 681-686.

A brief analysis of the two articles criticized in the alleged libel seems necessary. In the preliminary report, plaintiff refers to the fact that tens of millions of persons listen to the radio, some twenty millions of whom, the great majority women, listen to daytime serials, the "soap operas" as they were called upon the argument. The reader is concerned with emotionally unbalanced adults, particularly women of the fourth and fifth decades of life. Within the year preceding the article, some of his patients suffered unexplained relapses. After a conversation with one of them, and an informal poll of other patients, he was pointed to the radio as a fruitful field for research. He listened to ten daytime serials, two of which are analyzed in his report. He listened alone, made full notes, later studied them, and prepared an analysis of what he had heard. He found that the most frequently presented emotions, etc., were those of sex, sexual jealousy, pain-

fear, rage, revulsion, frustration and insecurity. There did not appear to be any "happy" characters in either serials; all were preoccupied with problems of their own, and which others made their own. They no sooner solved one problem than they were involved in another. His admission, that the people portrayed really exist and that some of the situations presented were taken from life, did not invalidate his criticism that they pandered to perversity and played up destructive conflicts, releasing to the emotionally distorted the same as would a lynching bee, or a crime passionel, or, as in the past, a witch burning. The cumulative effect "of a diet of corrupting melodrama could not fail to produce an 'anxiety state'". The emotions created by both serials, whatever their purpose, was to create destructive tension, and they followed each other so rapidly that the audience at the end of each episode would feel as if it had been drawn through a knot-hole. The effect upon the emotionally unbalanced cannot be imagined. His summary was that the dominant pattern in both serials was that of a problem play in which nearly all dramatic values are destructive; and he concludes that, as a technique for the prosecution of the war, induced anxiety may be justified; but "for selling soap or any other product is as unpatriotic as it is unnecessary and destructive of national morale".

The second article states that the author, in his previous study, had found alarming suggestions of the "insidious and devitalizing drain upon a large section of the American radio public produced by the cumulative effect of listening to certain daytime serials". The conclusions reached, while definite, were of necessity preliminary. But the results obtained and the critical comment elicited from social, political and religious leaders made another survey inevitable. He studied eight programs, listened alone to each over a period of two months, and took full notes, which were subsequently expanded at leisure. Another investigator listened in another room and made notes in a like manner. Pulse and blood pressure readings were made of both before and after, and a detailed analysis of that part of the survey will be published when completed. A sameness was found to prevail in all serials studied—to produce mass acceptance by a mass audience— dramatic, innuendo, lack of denouement and soliloquy; psychological, identification, autism (daydreaming), projection, and acoustic sound effects combined to produce

a background in which ominous threats, terror and mounting hysteria were reflected. In one serial the repeated fanfare of music and jangle of voices, climaxed by an orgiastic frenzy, were reminiscent of the roll of drums of doom in an African jungle or the background of woodoo rites laid in the dark moon of a Haitian night. The patterns studied betrayed a morbid preoccupation with the abnormal. In discussing every day people, in some of the serials, the point was that they offered anti-social conduct almost as a norm for behavior of average human beings. "What shall we say then to subjecting audiences to deluges of venom to be experienced vicariously?" All basic dramatic material of the programs was offered as family life, but in each the abnormal and subnormal were substituted for the normal in a world in which murder, illegitimacy, adultery, insanity, suicide, disease, pathological love, heartbreak, revulsion, rankling hatred, "the ultimate in human vileness are the morsels offered to tempt the radio palate. Truly the authors have screened the emotional sewers, drained the emotional swamps for much of their material". The effects were stated—physiological, tachycardia, arrythmias, increase in blood pressure, profuse perspiration, tremors, vasomotor instability, nocturnal frights, vertigo, gastro-intestinal disturbances; and psychological—emotional irritability, malaise, insomnia, phobias, inability to concentrate, emotional instability, varying degrees of depression. He continues: "When everything which is held to be sacred is mocked at hour after hour for millions of listeners we can discern the *first split in the unity which is essential for complete and successful prosecution of the war*." In the field of drama, radio renders not a service, but a disservice; it is inclined to break down belief in the family and its importance and in the solidarity of the nation, with moral nihilism as the result, the first step in the totalitarian conquest of nations. He, of course, comments on other programs of which he approves; and in summary, he asks what is the explanation of the sponsors responsible for the programs studied? The answer of one, that it keeps in close touch with public acceptance, comes in for its share of criticism by the statement that mass appeal apparently outweighs any considerations of morality, decency or patriotism. And in conclusion, he writes: "To use the hearts and minds of millions of women without regard to their mental or emotional welfare to sell any product is little short of treason in a nation at war."

Necessarily, this is but a brief analysis of plaintiff's two articles, but I think it generally outlines the general purport of them. It is fair to assume that, having dealt such stout blows and criticism at an industry which, by and at large, seems to be rendering a pretty fair service to a very large and increasing audience, he could hardly expect a gentle or meek reply. On the contrary, he could expect what he had given, and should be willing to take it. Has the defendant, then, by publishing the invited reply transcended the bounds of fair criticism and comment? Is the reply libelous per se?

The publication attached to the complaint shows that the virtues or shortcomings of daytime serials have been and are being studied by the broadcasting companies, as well as by capable and eminent physicians and psychiatrists, among whom is the plaintiff. The subject has obviously become a matter of considerable public importance and discussion.

The accused article itself can hardly be called a scientific monograph. It bears evidence, as Judge Crane wrote in the Briarcliff case, of the "touches of style which go to make the article readable" [260 N.Y. 106, 183 N.E. 198] and the touch of the "piquant pen". Obviously it was intended to poke some fun, in contrast to the "strong sentences, heavy charges and lugubrious conclusions" in the plaintiff's articles. The writer admits there is probably much of genuine and clinical interest, but states that there are no people in radio with whom he had talked who can ascribe to plaintiff's two reports any findings likely to benefit the condition he has attacked. There may be something in that.

The complaint specifies eighteen particulars which it is claimed are false and reflect upon plaintiff's ability and integrity in his profession and otherwise; and in a "catch all" allegation pleads that in addition there are interwoven many statements not in themselves false, but which represent in a wholly false manner the plaintiff and his work. The length of the article forbids its incorporation as a whole. We may consider those parts to which plaintiff calls attention.

Fault is found with the title "Dusting Off Dr. Berg", the frontispiece where it is stated that the writer "Dusts Off Dr. Berg, the daytime serial critic"; the index where

it is stated that the writer "Shoots holes in the arguments of a psychiatrist who has become the soap opera's severest critic"; and a short note between the title and the body of the article in which it is written "As a psychiatrist, readying a third diatribe on the daytime serial, it is hoped that this time he will supply radio with some facts". By innuendo, the plaintiff alleges that these charge him with incompetence with respect to the subject matter, and in his previous writings he has not supplied facts (Complaint, paragraph 6, a, b). I cannot read any charge of incompetence in the words mentioned, and the innuendo clearly, in my opinion, is distorting. The use of "Dusting Off" the daytime critic creates no libel; it is no more than a facetious way of saying that the "writer shoots holes in the critic's arguments" or attempts so to do. These portions do not attack plaintiff as a physician or psychiatrist, but as a critic; and the "dusting off" or the "shooting of holes" are aimed at his literary productions and arguments, and not at him individually. The note between the title and the article in which it is hoped that he will supply facts in his next writing doubtless is a charge that he had not supplied facts in his previous efforts. If, however, that charge is true and the truth appears from the writings themselves, there could be no libel. I doubt that they would be libelous even if false. Cook v. Mirsky, 252 App.Div. 496, 299 N.Y.S. 912, affirmed without opinion 278 N.Y. 524, 15 N.E.2d 676. Surely one can disagree without being charged with a libel. But I think the facts are lacking. The articles contain the personal opinions of the author; they do not purport to show the results obtained from the large audience which is said to listen to them, nor from normal listeners, nor from adolescents, nor from women at the climacterium, nor from the investigator mentioned in the second paper, nor in fact from the author himself, except in his personal opinions. He promises to remedy this in the third paper to come, where will be stated in detail the statistical analysis and selected clinical and psychological procedures resulting from the investigation already mentioned. The criticism is of the articles and not of the author, except as indirectly they may reflect against him for his failure, implicit in the articles themselves, to state facts and results.

It is then written that plaintiff's writings were sensational (id. c), which by innuendo he says charges that they created a sensation without substance. I can see nothing in such a conclusion. To make the charges which plaintiff has made against serials which have a listening public as large as plaintiff asserts, could not be anything else than sensational. To say so is not libellous, nor unfair comment.

We then read "Both of these papers purport to be scientific approaches to a vexed and moody problem" (id. d), by which defendant meant that the papers were not scientific approaches, with which innuendo I cannot agree. They do purport to be scientific approaches to a vexed and moody problem. The first paper states itself to be a study of certain programs and their effects upon the audience, adolescents and women at the climacterium; the second an approach to the same problem. To state that they purport to be what they are is not a libel.

Criticism is then made of the words "The initial falsity of such billing has already occurred to many radio people who wonder why the reader is referred, for example, to such a source as Margaret Mead's 'Growing Up in New Guinea' when Berg's subject matter was supposed to deal with the effects of daytime drama on the people who listen to it. That he did not do this and that he did not try to do it is the reason broadcasters imputed to him motives that may be considered questionable" (id. e, f). Plaintiff says that these charged him with presenting a false bibliography, and that he had written papers with dishonest motives. Here again, I think his innuendo is unwarranted. The "billing" referred to obviously refers to the title of the papers, and the title is not indicative of what is contained in the article. It was to be a preliminary report as to the effect upon audiences, adolescents and women at the climacterium, which it is not. If "billing" may be said to refer to the bibliography, a reference to the same may fairly raise a question as to whether the billing is or is not false. In the last analysis, however, the criticism is of the work and not of the person. The words that "broadcasters have imputed (to the plaintiff) motives that may be considered questionable", may fairly be construed as charging plaintiff with seeking undue publicity, and that, it seems to me, is the most that can be said about it. A reading of the two articles and the caustic language used in them might justify such a statement. The fact that he did not "stick to his last" would also serve likewise.

The next item in the criticized article of which plaintiff complains reads as follows: (id. g, h):

"His first paper fooled several people. In explaining the appearance of the second Dr. Berg has written: 'The results obtained (in the first paper) and the critical comments they elicited from social, political, and religious leaders made another and more comprehensive survey inevitable.' We are not told who any of these civic nabobs are and none of the comments urging the inevitability of paper two is anywhere reproduced, but the paper is before me and it will probably fool several more social leaders and maybe some political and religious ones, too. If it fools any broadcasters, or even any armchair logicians, I will be surprised.

"I *think it is important at the start to point out that these papers are not scientific approaches.*"

He charges by innuendo that the defendant meant and readers believed that it was plaintiff's purpose to deceive the public, that he had succeeded in part in doing so, and that plaintiff was incompetent and dishonest. I think the innuendo is much broader than can be inferred from the part quoted. It would not justify a charge that the defendant meant that it was plaintiff's purpose to deceive the public, or that he was incompetent or dishonest. The criticism, in any event, is of the plaintiff's writings. If the readers of them expected to find therein something about the effect of daytime serials upon audiences, adolescents and women at the climacterium, they would have been fooled. They would have been regaled by the effect upon the plaintiff. Much of the comment can hardly be said to be of a scientific character, and as I have pointed out before, the clinical and psychological data are to be forthcoming in the next paper. I cannot see that plaintiff has been at all libeled, or that the defendant has gone beyond the bounds of fair criticism and comment in these statements.

He next criticizes the following paragraph, without innuendo (id. i, j):

"According to the title of the first paper, readers had every right to expect remarks about the existing radio audience, something about adolescents, and finally something of the special case set up by his professional interest in his own patients. The paper carries no information for any of these categories. No tests of the normal radio audience were made, no tests of adolescents, no tests of 'women at the climacterium.' Thus far in his effort to prove that daytime radio is harmful to the people who listen to it, he has investigated its effects on only two people—himself and his assistant. This is a very unscientific approach for a scientist. Actually his first paper is a splenetic, undocumented summary of personal suspicions, and alarms based on the opinion of a self-acknowledged newcomer to daytime drama. Throughout it is prejudiced, naive, unsupported. It disavows scientific argument by begging its own question. Dr. Berg, after listening to a quantity of these programs, has assumed to be true that which remains unproved. He found them bad for himself. They are, therefore, bad for all."

If the two articles mentioned do not prove the truth of the quoted statements, it is still perfectly obvious that they are criticisms of the writings themselves and not directly of the plaintiff.

The article then reads (id. k, l):

"Radio has no room for casuistry, and if in this instance the public has been momentarily impressed by the eloquence of a reputable psychiatrist, radio is still waiting patiently for some facts.

"His article would have received more hospitable attention from radio generally had his title been changed to: 'A Study of Certain Radio Programs and Their Effects on Some of My Patients.' This at least would have suggested that things were likely to stay closer to the true materials of his inquiry. But this also would have been misleading, for these were not, as it turned out, the people who were the subjects of his research. Neither were adolescents. Neither were 'normal' people.

"Dr. Berg had a conversation with one of his patients whose improvement was being slowed up somewhere. Radio seemed to be doing it, and this suspicion led him to look into it further. This was good scientific reasoning. Other patients were approached (an unnamed number, and of unspecified condition) and these were, to use Dr. Berg's words, 'informally polled.' From this point on, science and reason take their leave of Dr. Berg and never return to help him, for he put himself on the stage of his own microscope as the subject to be scrutinized. It would, therefore, seem appropriate once more to change the title of his paper, this time to read: 'A Study of Certain Radio Programs and Their Effects

on Me.' With this, radio could have no quarrel, for that is where all his findings came from."

I see nothing in this which is libelous or beyond the bounds of fair comment and criticism. It is limited to a criticism of the writings under discussion, and would not be libelous even if it were so fantastic that no reasonable man would agree with it. Restatement of the Law of Torts, § 609.

The article then reads (id. m):

"What did Dr. Berg find? Under the heading, 'Material for Analysis' he has listed seven items. These have to do with story content and they are as follows: sex, sexual jealousy, pain-fear, rage, revulsion, frustration, insecurity. Anyone in radio could expand this list considerably, and many have. There isn't any secret about it. And there is no secret about this either—that if you take these instruments away from fiction writers, there will be little fiction, for these are the instruments of collision between character and circumstance. He challenges the right, for example, of the 'Road of Life' to dramatize the story of an uncle and aunt who have their niece unjustifiably committed to an insane asylum so they can steal her money. What is a fiction man to do if the niece is justifiably committed? Dr. Berg, himself a novelist, as well as a lecturer, doctor, psychologist, and medico-legal expert, would be hard put to it on such an assignment. 'Is there no drama,' he asks, 'in the identification of characters and social values with the good, the true, the reverent?' Dr. Berg, there is mighty little and you know this yourself.

"Radio objects to the reckless application he has made of his findings; it objects to the mounting hysteria of his surmises; and it suspects that much of the popular acclaim accorded his diatribes proceeds more from the phosphorous fury of his vocabulary than his force of logic."

Plaintiff complains of the words that he made reckless application of his findings. This is obviously a criticism of his articles. I can see nothing libelous in it, even were it not fair criticism and comment. So much of the article as is quoted explains just what the writer had in mind and would seem to justify his comment.

The next portion of the article criticized reads (id. n):

"Dr. Matthew N. Chappell, a psychologist and a one-time colleague of Dr. Berg, has also written on this subject and makes the following statement: 'It is my belief that the physiological facts are quite different from those presented by Dr. Berg. This belief arises from two conditions. First, if listeners experienced the marked physiological turbulence which Berg claims to have found, listening to the daytime serial drama would be attended by such strong feelings of unpleasantness that no one would ever listen. Secondly, in order to be able to project oneself into the action and characters of a daytime serial, one must find them of interest * * *. Dr. Berg is a cultured, intelligent man with well developed literary taste. He could not possibly find the problems and solutions presented in the serial dramas to be of intense interest to him * * *. Assuming that he did measure significant physiological changes in himself and his assistant. Of what could they be significant if not of the effect of the dramatic action? There is at least one alternative which I believe to be more probable than Berg's conclusion.

"'The physiological changes which attend anxiety, fear, etc., are identical with those which attend anger. Dr. Berg does not like the daytime serial dramas. In fact, he dislikes them most heartily. It seems quite probable that, while Dr. Berg listened and made his physiological measurements, he boiled more or less quietly. If this were the case, the physiological changes which Berg found would be entirely understandable. They would be the indices of his anger, which has no relation to the problem of changes produced by daytime serials in their regular listeners.'"

By innuendo plaintiff says that the defendant meant that he had made false statements of alleged fact, and if Dr. Chappell did so write defendant republished a false statement to that effect. Surely the defendant had the right to publish remarks of some other eminent psychiatrist who disagreed with Dr. Berg. This certainly would not be an accusation of deliberate falsification, and it would be entirely within the authorities relating to fair comment and criticism. The reasons for Dr. Chappell's disagreement are stated, and, unless I am very much mistaken, they negative a charge of scientific dishonesty.

The article then reads (id. o):

"The sheer violence of Dr. Berg's discourse in the two papers studied has led me to examine some of his own writings on subjects not connected with radio and

a few of these which I shall mention and comment upon are recommended to the attention of any reader who would like to form an opinion for himself. In 1932 he published a book called 'Revelations of a Prison Doctor.' It begins with recollections of tales of Siberian floggings, takes us through a collection of unsavory cafes in Berlin, through an insane asylum where we witness the tortures of a victim of the water-cure via fire-hose, and finally through practically every cell on Welfare Island.

"Throughout the book Dr. Berg's primary preoccupation is with homosexuality. Dope and dope addicts get second billing, prison rackets third. I do not know why Dr. Berg wrote this book. I don't believe he wrote it to extend medical knowledge; and it is doubtful if the book contains anything that a penologist doesn't already know. If its aim was altruistic and if it sincerely sought correction of the evils and miseries described, its tone is too sensational and its overtone too prurient to provoke the thoughtful or attract an influential company of the righteous. There is a suggestion in the last chapter that the book had a crusading intention. Appeals for the re-education of the public are made although no plan for this is set forth. I believe Dr. Berg wrote the book to sell to the public. He had every right to do this."

The part which plaintiff criticizes is contained in the words "Dr. Berg wrote the book to sell to the public", by which he charges that the defendant meant that plaintiff's motives were not as he stated in his book, for the purpose of improving conditions, but were purely mercenary. I cannot see anything in the innuendo, and I do not think that the charge that the plaintiff wrote the book for the purpose of selling it is a libel. He probably did write it for that purpose, as well as for the purpose of endeavoring to rectify the conditions which he there discussed. The article states that he had every right to sell the book.

Referring further to the book and immediately following the last quotation, the article reads:

"Its sequel, a novelized version called simply 'Prison Doctor,' appeared two years later and was sold to a motion picture company. So did a second novel, 'Prison Nurse.' Dr. Berg strenuously objects to the locales of daytime dramas. He lists the following as typical (and he is quite right):

hospitals, mental institutions, jail cells, courtrooms, bed-side scenes, death-bed scenes, sanitariums, laboratories.

"Chapter headings for Dr. Berg's 'Revelations of a Prison Doctor' read as follows: Sayonara (Japanese for 'au revoir'), Madhouse, Prison Doctor, 'Hypo,' Prison Rackets, Prison Riots, A Man Dies, 'Big Shots,' Twenty-four Hours, World Without Women, Men Like Women, A Sheaf of Lesser Lives, The Easiest Way (prostitution), 'Bug Tests,' World's Worst Prison, My Brother's Keeper, Let There Be Light.

"Of the novelized version which appeared two years later, Dr. Berg has written: 'It was a novel in which none of the characters were wholly imaginary and whose background was as authentic of prison life as my own reflections upon what I had seen and heard and felt, could make it. Though its figures were synthetic and some of the incidents had not occurred within the single setting, I felt and intended it to be an accurate depiction of prisoners and prison life. My reason for using the fictional form was that by sugar-coating the bitter pill which its truths were found to be, it might have greater influence and secure more general discussion than if it were written purely as a social document.' This is another way of saying that he shifted his merchandise from a local station to the Red.

"To me, it is curious indeed that Dr. Berg should deny radio's wardrobe those very garments in which so much of his own work is dressed. If Dr. Berg can find nothing wrong in publicizing the miseries of the doomed, the drugged, and the damned through the medium of books and motion pictures, why won't he let radio have a frustration or two? There ain't nobody here but us chickens, boss.

"If I may break a metaphor over the reader's head, it seems very much as if radio and Dr. Berg were in the same boat except that Dr. Berg is working the other side of the street."

By innuendo plaintiff said (id. p) that the words "Radio and Dr. Berg were in the same boat except that Dr. Berg is working the other side of the street", the defendant meant that the plaintiff's motives were not honest professionally and purposeful for the improvement of conditions, but were wholly mercenary and that he himself was guilty of dishonest and harmful publications. The innuendo is not borne out by the parts quoted and is entirely fantastic in my opinion. The criticism is obviously of the

804

articles written by the plaintiff. The reference to the other side of the street obviously means that Dr. Berg could and did use the various emotions of horror and dread and fear, etc. to prove his point, while now he criticizes the use by radio of some similar fictional characteristics to entertain those who care to listen to soap operas. There is nothing libelous in this.

Then the article reads:

"Radio's objection to Dr. Berg's criticism is clear. He has no evidence and has, therefore, proved nothing. The effects of daytime drama is discussed nowhere. He would seem to be talking about the effects of radio serials on 'unbalanced adults' who are so emotionally out of control they have had to come to him for professional treatment. He is not talking about the people for whom volume broadcasting is prepared. He is talking about nervous wrecks. Even this aspect of the listener problem is hearsay; it is hearsay even to Dr. Berg, for he looked no further into this group. He examined himself only. This is not enough."

Plaintiff complains (id. q) of the words, "He has no evidence, and has, therefore, proved nothing", by which he says defendant meant and readers believed that plaintiff had no professional competency to speak on the subject on which he wrote. I do not think the words quoted justify any such innuendo. I have already commented upon the so-called lack of facts to which the writer now apparently again averted. This criticism of the writings does not libel.

The article again reads (id. r):

"Dr. Berg might easily have converted his effort into a triumph of horse sense had he sealed his personal diaphoresis in the icebox of scientific discipline long enough to freeze his frenzy into a few facts and his science into those respectable channels of inquiry that most members of his profession consider their starting point.

"If his third paper, as he has indicated, produces an 'exact statistical analysis,' we will know considerably more regarding Dr. Berg's blood pressure and perhaps something of the breathing habits of his assistant. In any case it seems quite possible that Dr. Berg will contrive to turn the entire trilogy into a triumph of obfuscation, full of big words what us poor folks in radio don't hardly know the meaning of them—just another teleogical concatenation of sesquipedalian lucubrating—all whiz and pizzazz and canal water."

I do not see that this last quotation carries any libelous imputation. It is undoubtedly humorously written and bears again the touch of the "piquant pen". The writer indulges in the use of big words. He has criticized the plaintiff for doing the same. It is very doubtful if the average person reading it would understand what the latter part of it means; they are phrases which could not have affected the reputation of the plaintiff, although the writing of them may have gratified the literary vanity of the writer who composed them. Duffy v. New York Evening Post Co., 109 App.Div. 471, 96 N.Y.S. 629.

▆ In my judgment, the article complained of is not libelous, and does not exceed the bounds of fair criticism and comment. Practically every word of it is aimed at the writings; and while the criticism may indirectly strike the plaintiff, it does so only because the plaintiff was the author of the words criticized. It does not shame or disgrace him. It does not attack him in his person or in his profession. On the contrary, at various points it admits that what he had written may be of much genuine clinical interest to his profession; it characterizes the bibliography referred to as impressive and describes him as a reputable psychiatrist. It will undoubtedly reinforce the minds of those who disagree with the plaintiff, and probably will have no effect upon those who think as Dr. Berg has written. It certainly will not lower him in the opinion of right thinking persons. Even the quotation from Dr. Chappell states the plaintiff to be a cultured, intelligent man, with well developed literary taste, although it disagrees with his diagnosis contained in the articles criticized.

For the reasons stated, I think the complaint should be dismissed, with costs.