EMANUEL J. DEMOS, Respondent, *v.* THE NEW YORK EVENING JOURNAL PUBLISHING COMPANY, Appellant.

**Libel — when question, whether a certain publication is libelous or not, is for the jury to determine.**

1. If the language of an alleged libel is ambiguous and capable of an innocent, as well as of a disgraceful, meaning, the question becomes one for the jury to settle.

2. In an action for libel the court charged that the articles were libelous *per se;* defendant's counsel then requested the trial judge

to charge that "it is for the jury to determine whether the publication complained of is libelous," and, further, "that if the jury find that the publication complained of does not have the meaning claimed in plaintiff's innuendo, and that the words in their natural sense are capable of an innocent meaning, not defamatory of the plaintiff, they should find a verdict for the defendant." These requests were refused and the defendant excepted. *Held*, error, and that the trial judge should have allowed the jurors to decide whether it could be understood according to the meaning put by the plaintiff upon it by innuendo.

*Demos* v. *N. Y. Eve. Journal Publishing Co.*, 146 App. Div. 947, reversed.

(Argued November 21, 1913; decided December 16, 1913.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered November 20, 1911, modifying and affirming as modified a judgment in favor of plaintiff entered upon a verdict.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Clarence J. Shearn* for appellant. The court erred in directing a verdict for the plaintiff, holding the publication to be libelous *per se*, and refusing to submit the meaning of the publication to the jury. (*Morrison* v. *Smith*, 177 N. Y. 366; *Irving* v. *Irving*, 121 App. Div. 258; *Hoey* v. *N. Y. Times Co.*, 138 App. Div. 149; *Hayes* v. *Ball*, 72 N. Y. 418; *Garby* v. *Bennett*, 40 App. Div. 163; 166 N. Y. 392; *Vincent* v. *Onderdonk*, 107 App. Div. 626; *Warner* v. *Southall*, 165 N. Y. 496; *Hemmens* v. *Nelson*, 138 N. Y. 517; *Foot* v. *Pitt*, 83 App. Div. 76; *Crashley* v. *Press Pub. Co.*, 179 N. Y. 27.) The court erred in refusing to charge the jury as requested "that if the jury find that the publication complained of does not have the meaning claimed in plaintiff's innuendo, and that the words in their natural sense are capable of an innocent meaning, not defamatory of the plaintiff, they should find a verdict for the defendant." (*Irving*

v. *Irving,* 121 App. Div. 258; *Morrison* v. *Smith,* 177 N. Y. 366.)

*Joseph M. Proskauer, Abram I. Elkus, Henry W. Sykes* and *William B. Devoe* for respondent.  The court did not err in holding the publication to be libelous *per se,* directing a verdict for the plaintiff and refusing to submit the meaning of the publication to the jury. (*Stokes* v. *Stokes,* 76 Hun, 314; *Winchell* v. *Argus Co.,* 69 Hun, 354; *Hughes* v. *Evening Post,* 115 App. Div. 615; *Turton* v. *N. Y. Recorder Co.,* 144 N. Y. 144; *Moffat* v. *Cauldwell,* 3 Hun, 26; *Grant* v. *N. Y. Herald Co.,* 138 App. Div. 733; *People* v. *Schermerhorn,* 203 N. Y. 71; *Triggs* v. *Sun P. & P. Co.,* 179 N. Y. 153.)

Gray, J.  This is an action of libel and the complaint charges, in several causes of action, the publication and republication, in different editions of the defendant's newspaper, of the news item, which is alleged to be libelous.  The pleading sets forth that "on September 23d, 1906, the dismembered trunk of the dead body of a man was discovered in a pit, at the corner of 11th Avenue and 36th Street, in the Borough of Manhattan, City of New York, (and that said body was identified to be the body of one Jack Mano).  That thereafter, and on September 24th, 1906, one Capanake and one Dandrakes were arrested on suspicion by the police authorities of the City of New York, charged with having some connection with the murder of said person, whose body was found as aforesaid."  The first alleged libelous publication was as follows: "Further testimony against the two men now held as suspicious persons was given to-day by John Demos, who runs a restaurant at Old Slip.  He was taken before Acting Capt. Flannery, in the West Thirty-seventh Street Station House and put through the third degree.  The rigorous questioning of Demos brought out the statement that Dandrakes and Capanake had tried to hire him to

kill Mano, offering him a large sum of money if he would put Mano out of the way." The succeeding publications complained of were, with no material changes in language, of the following: "John Demos, who runs a restaurant in Old Slip, declared to the police to-day, after being put through the third degree, that John Dandrakes and George Capanake, 139 Eighth Avenue, under arrest in connection with the headless body mystery, had offered him a large sum of money to kill Jack Mano, now believed to be the victim." Following each allegation of the libel were the further allegations, by way of innuendo, to the effect that, thereby, the defendant intended to charge, and did charge, that the plaintiff was an intimate associate of criminals and murderers, or persons arrested upon the charge of murder; that the plaintiff could be induced by the offer of a large sum of money to commit murder; that the plaintiff had concealed his knowledge of facts relating to the murder, until taken into custody and compelled by the police authorities, through mental agony, physical torture and severe cross-examinations, to disclose his knowledge, and that it was attempted to charge him with moral delinquency and failure to perform his duties as a citizen; thereby exposing him to the ridicule, contempt, prejudice and hatred of the inhabitants of the city and state, and to injury in his character and business as a restaurant keeper. The trial resulted in a verdict for the plaintiff and, on appeal from the judgment, the affirmance at the Appellate Division was with a sharp division in the vote of the justices.

I think that the judgment should be reversed and that a new trial should be had for errors in the instructions of the trial judge. Having read to the jury the alleged libelous publications and the innuendos of the complaint, the trial judge charged that "the articles * * * are libellous *per se*." This was excepted to by the defendant. The defendant's counsel requested the trial judge to charge that "it is for the jury to determine whether the publi-

cation complained of is libellous " and, further, " that if the jury find that the publication complained of does not have the meaning claimed in plaintiff's innuendo, the part that your Honor read from the complaint, and that the words in their natural sense are capable of an innocent meaning, not defamatory of the plaintiff, they should find a verdict for the defendant." These requests were refused and the defendant excepted. Thus, as the case went to the jury, they were instructed upon the law that the publications were libelous *per se* and they were precluded from considering their meaning, whether innocent or defamatory. With such instructions the jurors might well have regarded their duty as confined to the question of the amount of damages, which the evidence would justify them in awarding the person so libeled, and that they were not to concern themselves with the meaning of the words used. It had been, evidently, the view of the plaintiff that the meaning of the article was not clear; inasmuch as it was thought necessary to aver, at considerable length in the complaint, what the defendant intended to charge by its publication. In my opinion, he was rightly advised, in supporting his cause of action by the allegation that the article was intended to be defamatory in the respects averred; for I am unable to agree in the view that the reading of the publication, of itself, imports a disgraceful reflection upon the plaintiff's character, or standing, in the community.

The article relates to the possible culpability of two men, who were held upon suspicion of being concerned in a homicide. The plaintiff does not appear, from the article, to have been charged with it; or to have been arrested upon any charge; or to have been required by the police, except as a witness. It was in that capacity that he was brought before the police captain and if he was " put through the third degree " to obtain his testimony, concerning the two men under arrest, the method of examination may reflect discreditably upon the police officials;

2

but how could it reflect upon the plaintiff's character, or reputation? The expression of putting a person "through the third degree" has come to mean, commonly speaking, that he has been subjected to an extended and severe questioning, perhaps almost cruel in its rigor, at the hands of the police authorities to elicit material facts, which are deemed to be within his knowledge. If applied to a person under arrest in connection with the commission of a crime, its meaning would, naturally, be that the guilt of the person was suspected. When applied, as here, to obtain statements from a person concerning others, who were in police custody, it would, ordinarily, import a reluctance on his part to testify; for which there might be an innocent reason, in his mental make up, if not in his ignorance, or his apprehensions. Certainly, the words of this article do not, directly, charge the plaintiff with being in sympathy with the arrested men; or with having known anything of the crime before being brought before the police captain. Nor does his reported statement that the men "had tried to hire him to kill Mano," and had "offered him a large sum of money" to do so, necessarily, have a disgraceful meaning. The article does not charge him with accepting, or even with considering, the offer. According to the article, the "rigorous examination," to which the plaintiff was put, resulted in showing that the suspected criminals had failed in an effort to bribe him.

While, therefore, it is not easy to perceive how the publication complained of could have had the defamatory effect upon the plaintiff's character and standing complained of, nevertheless, as it cannot be said, as matter of law, that it was incapable of a defamatory meaning, the trial judge should have allowed the jurors to decide whether it could be understood according to the meaning put by the plaintiff upon it by innuendo. Under the settled rule of law, if the language of the alleged libel is ambiguous and capable of an innocent, as well as of a

disgraceful, meaning, the question becomes one for the jury to settle. (*Morrison* v. *Smith*, 177 N. Y. 366.) If the words used are capable, by construction, or in their connection and application, of the interpretation given by the innuendo, then a question of fact is raised for the jurors to consider. They should determine, in a case of doubtful meaning, whether the tenor and import of the publication are offensive and defamatory, and whether it could be so understood by the general public, or in the plaintiff's neighborhood. The mere improbability of the meaning claimed for it would not control the question of the right of the jury to pass upon it; the question would be, may the alleged libel be understood as the plaintiff claims.

For the erroneous instructions and rulings which I have mentioned, I advise the reversal of the judgment and that a new trial be ordered; the costs to abide the event.

CULLEN, Ch. J., WILLARD BARTLETT, HISCOCK, CHASE, COLLIN and MILLER, JJ., concur.

Judgment reversed, etc.