Dye, J.
(dissenting). In this libel action the plaintiff, W. Kingsland Macy (hereinafter Macy), has a judgment entered on a jury verdict in the amount of $50,000 against the defendant, New York World-Telegram Corporation, publisher of a New York City newspaper known as The New York World-Telegram and the Sun (hereinafter Telegram), which the Appellate Division, First Department, has unanimously affirmed, without opinion. The Telegram has appealed to this court by our permission.
The action has its genesis in the Hanley letter episode of the 1950 gubernatorial campaign. It appears without dispute that, for some time prior to the Republican State Convention, Lieutenant Governor Joe R. Hanley was being mentioned as a candidate for the office of Governor to succeed the Hon. Thomas E. Dewey who had announced his intention not to run for re-election. Macy, along with several other top-level party leaders, was actively promoting the Hanley candidacy and had received assurances of impressive delegate support. However, events combined to change the picture on the very eve of the convention, scheduled to open at Saratoga on September 6, 1950. It was then that Lieutenant Governor Hanley wrote a letter addressed to Macy in which he advised him of his reluctant decision to withdraw his name from consideration by the convention for the gubernatorial nomination and to accept instead the nomination *424 for United States Senate, in consideration of what he termed an “iron-clad, unbreakable arrangement”. The letter was dated September 5, 1950. In some undisclosed manner a copy or copies of that letter came into the hands of a third person, prominent in the party councils, who showed it to Mr. Macy that same evening. It was news to Macy as the original letter addressed to him was not delivered into his hands until the following day, September 6. As is not at all unusual at such a time, rumors began flying about as to the contents of the letter and high strategy meetings were held by the party leaders. The convention convened and Mr. Hanley was duly nominated for United States Senator. As the election campaign got under way it became apparent to the Republican campaign managers that something had to be done to counteract the rumors concerning the Hanley letter and it was decided to release the letter. Under date of October 18, the Telegram published it as part of a front page news story. The article narrated in great detail that “ according to several persons ”, Macy had attended a preconvention conference of party leaders. It was asserted in part:
“ Hanley Note Used at Spa by Macy
Sxjeeolk GOP Leader Demanded Senate Nomination for Himself
[According to several persons] present at the meeting, Mr. Macy threatened to make the Hanley letter public if he failed to receive the Senate nomination.
Deal is Turned Down.
But, these sources said, Mr. Macy was told there would be no such deal.”
Macy alleged in his complaint that such article as to him was false, and that, by its publication, the Telegram had ‘ ‘ intended to charge and did charge ” that he “in fact and in effect ” had used the Hanley letter in an attempt “ to extort ” the Senate nomination from the Republican party leaders for himself and to “ blackmail ” the said party leaders “ into nominating him ” for *425 that office under the threat of disclosure, and that he was not fit to hold public office; that the ‘ ‘ false and defamatory matter * * * was known to the defendant to be false and untrue ” and was published with “ malice ” and with the “ intent ” and “ purpose of injuring the plaintiff in his reputation, in his feelings and in his official capacity, and accomplishing his defeat at the election to be held on November 7, 1950 and in reckless disregard ” of his rights, and that by reason of said publication, Macy had been “ injured in his good name ” and “ reputation,” and had been ‘ ‘ held up to ridicule and contempt of his friends, acquaintances and the public, ’ ’ and had ‘ ‘ suffered loss of prestige and standing in his community and elsewhere all to his damage ”.
By its answer Telegram interposed truth as a complete defense and as a further partial defense alleged trustworthiness of the persons and sources of its information which it believed to be true.
We are all agreed that at the trial Telegram failed to establish the defense of truth or its partial defense of trustworthy sources of information and that the jury’s verdict of falsity was clearly justified by the evidence. We agree that the trial court quite properly left it to the jury to decide whether or not “ the reaction of the ordinary intelligent reader to that article would be such as would hold the plaintiff out to the scorn and contempt of that reader ” (More v. Bennett, 48 N. Y. 472). The jury’s affirmative answer was clearly justified (Mencher v. Chesley, 297 N. Y. 94; Hall v. Binghamton Press Co., 263 App. Div. 403, affd. 296 N. Y. 714).
It is quite true that at the time and for over 30 years prior thereto Macy was and had been a widely known government and political figure.[1] At the time of the alleged libel he was a candidate for re-election to the Congress of the United States as Representative of the First New York District. As such, his acts and statements could, of course, be freely commented upon *426 and criticized without complaint on his part so long as such comments and criticisms Avere fair and based on facts truly-stated (Briarcliff Lodge Hotel v. Citizen-Sentinel Pub., 260 N. Y. 106). However, it ceases to be fair comment whenever the complained of article falsely charges the person with “ corruption or gross incompetence ” holding him up to disgrace or contumely (cf. Mencher v. Chesley, supra; Julian v. American Business Consultants, 2 N Y 2d 1; Hall v. Binghamton Press Co., supra), particularly where persons holding public office or political office are concerned (Oma v. Hillman Periodicals, 281 App. Div. 240; Tanzer v. Crowley Pub. Corp., 240 App. Div. 203; Bennett v. Commercial Advertiser Assn., 230 N. Y. 125). Accordingly, we find no error in this aspect of the case.
Nor do we discern any error in the court’s modification of a request to charge made by appellant’s counsel respecting the alleged innuendo of crime based on the charge of “ blackmail and extortion ’ ’ by leaving it to the jury to determine ‘ ‘ Whether or not the article describes conduct in the general nature of one who has committed a crime of the description is for you to determine, but the statements made do not describe acts which would be sufficient to convict a person of either of those two crimes ”, to which an exception was taken.
To establish his prima facie case Macy did not have to prove that he had been falsely accused of crime, but merely that the article tended naturally and proximately to disgrace him and hold him up to ridicule and contempt (Mencher v. Chesley, supra; O’Connell v. Press Pub. Co., 214 N. Y. 352; Triggs v. Sun Print. & Pub. Assn., 179 N. Y. 144; Morey v. Morning Journal Assn., 123 N. Y. 207).
Whether the article in fact charged Macy, a public and political official, with conduct of a general nature of one Avho has committed crime, though not amounting to a crime, but exposing him to disgrace and contumely, was quite properly a matter for the jury to determine. We long ago said: “ the scope and object of the whole article is to be considered, and such construction put upon its language as would naturally be given to it ” (More v. Bennett, supra, p. 476; Kimmerle v. New York Evening Journal, 262 N. Y. 99; Demos v. New York Evening Journal Pub. Co., 210 N. Y. 13).
We also agree that there was no error in the exclusion of certain testimony aimed at showing how and when a copy of *427 the Hanley letter got into the hands of leaders of the Democratic party since, obviously, such testimony could have no bearing on the truth of the charge Macy complains of.
We now turn to the evidentiary ruling which permitted plaintiff to introduce testimony respecting the effect of the publication on others which, it is contended, amounted to an usurpation of the function of the jury in determining the gravity, if any, of the alleged libel. Specifically, the complained of testimony was to the effect that persons had telephoned the plaintiff saying “ it was something I shouldn’t have done ”; “ letters came in, addressing me as a skunk”; “ people * * * would look * * * askance at me”; that a local newspaper cartoon depicted plaintiff as a skunk; that the Chevy Chase Club in Washington, of which he had been a member 25 to 30 years, gave notice that his membership was no longer desired, and that the House of Representatives refused to seat him upon his return to Congress.
The case of Bishop v. Neiv York Times Co. (233 N. Y. 446), heavily relied on by the appellant, requires no different ruling, for there we expressly stated (p. 454) that “ a plaintiff is not compelled to rely upon a favorable presumption with which the law endows his cause of action but that he may prove if he can that he has been avoided and shunned by former friends and acquaintances as the direct and well-connected result of the libel ”.
In Mattox v. News Syndicate Co. (176 F. 2d 897), the court admitted evidence of treatment of the plaintiff by others, following a libelous publication, over a claim that such evidence was hearsay and therefore incompetent, on the ground that where a person’s feelings or beliefs are relevant his declarations regarding such feelings are competent evidence of their existence.
Numerous other jurisdictions likewise hold that evidence of aversion or contempt manifested as a consequence of a libelous publication, is admissible for the purpose of showing its hurtful tendency or damaging effect (Burrows v. Pulitzer Pub. Co., 255 S. W. 925 [Mo.]; Burt v. McBain, 29 Mich. 260).
As we have seen, the complaint in this action specifically alleged that the plaintiff had been injured ‘£ in his feelings, mind and body, and has been held up to ridicule and contempt of his friends, acquaintances and the public ”,
*428 It is contended by tbe appellant that while any single item of such testimony standing by itself might well fail to satisfy the test of harmful error, the allegedly cumulative effect is to cause harm of a more serious nature amounting to grievous prejudice, because the defendant had no opportunity of testing such proof by cross-examination of the alleged sources. In Bishop, opinions of third persons were received as to the gravity of the libel while in this case the proof concerned the reaction of third persons and the embarrassing occasions flowing from the publication. Obviously, there is a vast difference between the two kinds of proof. Testimony in the form of third-party opinion is wholly inadmissible (Linehan v. Nelson, 197 N. Y. 482). On the other hand, testimony describing third-party reaction on the belief that such publication is true, is quite different. The admission of such testimony in its final aspect was harmless error, particularly since the primary and dispositive issue in this case is the truth or falsity of the publication. The jury, we have noted, properly found falsity (cf. Farrington v. Star Co., 244 N. Y. 585).
Even if we assume that Macy’s testimony concerning the effect of the libelous publication upon his status amongst, and relationship with, his friends and associates was objectionable, the question still remains whether it was in fact adequately objected to. The law is well settled that, unless a party adequately objects, he cannot avail himself of any error in the admission of testimony, even as regards pure hearsay. Here, though Macy’s allegedly objectionable testimony covers some 25 folios of the printed record on appeal, we find only two objections by appellant’s counsel which were not sustained and these relating to utterly harmless testimony. One searches the record in vain for any other objections to this line of testimony which were overruled. In fact in all other instances where an objection was made, the court sustained the objection or struck out the testimony. We do not read the so-called “ omnibus ” objection as applying to the whole of the Macy testimony, since subsequently counsel for Telegram took separate objections to sundry questions and answers, and, where material, such objections were sustained.
The reprint of the libelous material in The Babylon Leader, a suburban newspaper, manifestly was not offered as proof of the libel but rather to show how widely the defendant’s libel had been spread, and was admissible for that purpose (Scott v. *429 Times-Mirror Co., 181 Cal. 345). According to the record, the plaintiff initially offered in evidence only that portion of The Babylon Leader article which was a reprint of the defendant’s story together with a showing that it had a daily circulation of about 7,000. Nonetheless, appellant sought to capitalize on the admission of the article by insisting that parts of it not purporting to be a reprint but which were unfavorable to Macy be read to the jury. Even so, plaintiff did not contend nor did he offer to show a separate and distinct libel by the Leader article for, indeed, he could not have done so. To have done so would have collided with the rule that the original publisher is not responsible for subsequent publications of the same libel by others (Raines v. New York Press Co., 92 Hun 515). Treating such testimony in the light of the limited purpose for which it was received (to show widespread dissemination of the libel) and keeping in mind the benefits derived therefrom by the appellant, as well as the limited daily circulation of the Leader as compared to the well over one-half million daily circulation of the Telegram, it cannot reasonably be said to constitute harmful error.
The judgment appealed from should be affirmed, with costs.
Van Voorhis, Burke and Bergan*, JJ., concur with Desmond, J.; Dye, J., dissents in an opinion in which Conway, Ch. J., and Froessel, J., concur; Fuld, J., taking no part.
Upon reargument: Judgment of the Appellate Division and that of Trial Term reversed and a new trial granted, with costs to abide the event.

. Mr. Macy was a member of the United States House of Representatives, having been duly elected from the First New York District in 1946 and re-elected in 1948; was chairman of the Suffolk County Republican Committee for more than 24 years; chairman of the New York State Republican Committee for 4 years; delegate to the National Republican Convention held in 1928, 1932, 1940, 1944 and 1948; member of the Constitutional Convention, State of New York; Regent of the State of New York; Senior Trustee of the Seamen’s Bank for Savings, New York City; director of the South Side Bank of Bay Shore and is publisher of various newspapers circulating in Suffolk County, N. Y.