William F. **BUCKLEY**, Jr., Plaintiff,

v.

Gore **VIDAL**, Defendant.

No. 69 Civ. 1933.

United States District Court,
S. D. New York.

May 13, 1971.

See also 50 F.R.D. 271.

Hellerstein, Rosier & Rembar, New York City, for plaintiff; Charles Rembar, Stephen F. Rohde, New York City, of counsel.

Fitelson & Mayers, New York City, for defendant; Harold J. Sherman, New York City, of counsel.

## OPINION

LEVET, District Judge.

This is a motion by plaintiff, pursuant to Rule 56, F.R.Civ.P. seeking summary judgment dismissing each of defendant's four counterclaims on the ground that there is no genuine issue as to any material fact and that plaintiff is entitled to judgment as a matter of law.

The gravamen of each counterclaim is an alleged defamation by Buckley of Vidal. The first three counterclaims all have to do with Buckley's comments on Vidal's published writing, and particularly, Vidal's novel, Myra Breckinridge. The fourth has to do with Buckley's letter to the publisher of the New York Review of Books asking that publisher to confer with Buckley before publishing

a manuscript submitted by Vidal which Buckley felt was damaging to his reputation; the letter characterizes the manuscript as defamatory and untrue.

Plaintiff contends that the utterances were, in each instance, privileged. As to the first three counterclaims, plaintiff asserts the privilege of fair comment. As to the fourth, plaintiff relies on the privilege which grows out of an individual's legal interest in protecting his reputation.

The specific statements by plaintiff which form the basis of defendant's counterclaims are as follows:

As a first counterclaim Vidal alleges that in a television broadcast some time in August 1968, Buckley made the following statement:

"Let Myra Breckinridge [referring to the novel bearing such name and thereby identifying its author, Gore Vidal, with such novel] go back to his pornography * * *."

The second counterclaim refers to the following two utterances which appear in various versions of a manuscript which was eventually published in Esquire magazine:

"Vidal and I awaited the sound of the bell. * * * there and then I resolved in hitting him back hard with a *tu quoque* involving Myra Breckinridge—which I had not yet read, thinking it simply a pornographic potboiler done for money * * *." [1]

"Let Myra Breckinridge [referring to the novel bearing such name and thereby identifying its author, Gore Vidal, with such novel] go back to his pornography * * *."

As the basis of the third counterclaim it is alleged that Buckley made the following statement in a television broadcast in August 1968:

"When I see the sort of gimmick, I do not think it is right to present Mr. Gore Vidal as a political commentator of any consequence since he is nothing more than a literary producer of perverted Hollywood-minded prose."

The fourth counterclaim is based on a letter from Buckley to the publisher of the New York Review of Books and to the publishers of certain other magazines. The letter read as follows:

"Last August, I was defamed on network television by Mr. Gore Vidal. Mr. Vidal has not retracted his libel nor apologized to me. On the contary, he has sought to give renewed currency to that libel and to launch others, to which end he submitted a manuscript to Esquire magazine which Esquire declined to publish because it was defamatory and untrue. Mr. Vidal's activities have left me with no other recourse than to a lawsuit, and accordingly I have filed suit against Mr. Vidal for five hundred thousand dollars in damage. I advise you of these proceedings because I have been informed that Mr. Vidal is bent upon circulating charges about me which are absolutely untrue. I write to register my willingness to cooperate with you in any way—indeed, I earnestly request that you hear me out—so as to guard against your journal's inadvertently circulating Mr. Vidal's defamatory material.

"Yours faithfully,
Wm. F. Buckley, Jr."

We turn then to the first three counterclaims, all of which have to do with statements by Buckley allegedly characterizing Myra Breckinridge as pornography. As mentioned above, the defense here is the privilege of fair comment.

When an author submits his work to the public he must, of necessity, expect criticism of that work. He is said, in fact, to invite criticism, and no matter how hostile such criticism may be, the critic enjoys a privilege to make such critical comments as long as the comment does not go beyond the publish-

[1] The phrase, "thinking it simply a pornographic potboiler done for money," never appeared in the final Esquire article.

ed work itself to attack the author personally, Berg v. Printer's Ink Pub. Co., 54 F.Supp. 795 (D.C., 1943); the facts are truly stated, Shenkman v. O'Malley, 2 A.D.2d 567, 157 N.Y.S.2d 290 (1956); the comment is fair, Triggs v. Sun Printing and Publishing Assn., 179 N.Y. 144, 71 N.E. 739 (1904); and the comment is an honest expression of the writer's real opinion, Briarcliff Lodge Hotel v. Citizen-Sentinel Publishers, 260 N.Y. 106, 183 N.E. 193 (1932); Hoeppner v. Dunkirk Printing Co., 254 N. Y. 95, 172 N.E. 139 (1930); I Harper & James, The Law of Torts, § 5.28 at p. 457.

Plaintiff contends on this motion that there is no genuine issue of material fact as to any of the aforementioned elements of the privilege and that summary judgment should therefore be granted dismissing defendant's counterclaims.

As to the first of these four elements, there can be no serious argument that the statements by Buckley go beyond the literary work to attack Vidal personally, except so far as any criticism of a work of art must necessarily imply a criticism of its author.

Any allegation that Myra Breckinridge is pornographic obviously suggests to the public that its author is a pornographer. However, such necessary implications of comments directed at the work itself are not sufficient to turn otherwise protected criticism into unprotected criticism. If the rule were otherwise, the privilege of fair comment would cease to exist.

We need not tarry long over the requirement that the facts be truly stated. It has no applicability here since we are dealing entirely with a statement of opinion by Buckley. He made no assertion of fact as to the contents of the book or any other matter, except perhaps for the fact that Vidal is the author of Myra Breckinridge—a fact certainly not in dispute. His statement is confined totally to an expression of opinion about the worth and character of the book.

This brings us to a consideration of the requirement that the comment be fair. This requirement has been defined by the New York Court of Appeals as follows:

"The comment must be fair. It must be a reasonable inference from the facts truly stated * * *. We have held that even in the absence of an admission as to the truth of the facts, it is sufficient if the facts form a reasonable basis for inference and the comment connected with the facts." Julian v. American Business Consultants, Inc., 2 N.Y.2d 1, 155 N. Y.S.2d 1, 137 N.E.2d 1 (1956).

Here, of course, the reasonableness or fairness of the comment must be measured not against "facts truly stated"— since there were none—but against the contents of the book in question, Myra Breckinridge. The question resolves therefore to one of whether it would be unfair to characterize Myra Breckinridge as pornography.

Two points must be made perfectly clear at this juncture:

First, the latitude allowed the critic in this area is quite large. As the court held in Berg v. Printer's Ink Pub. Co., supra, 54 F.Supp. at p. 797:

"If the public is to be aided in forming its judgment upon matters of public interest by a true interchange of opinion, it is essential that honest criticism and comment, no matter how foolish or prejudicial, be privileged."

Thus, the court in that case, in defining the range of license allowed a critic under the fairness standard held that "The criticism need not express an opinion with which any person of reasonable intelligence and judgment could possibly agree." Id at p. 797. This, needless to say, gives the critic some considerable degree of impunity to speak his mind freely.

Secondly, the question before this court is not whether the book, Myra Breckinridge, is "pornographic" or "perverted Hollywood minded prose." This is not a pornography trial. The ques-

tion for the court is, as we stated in our earlier unreported opinion dated March 4, 1971, whether plaintiff's comments are so obviously without basis in fact as to be adjudged unfair or dishonest.

■ Let us then look at the book in question. Myra Breckinridge is a novel which deals quite graphically and at some considerable length with a wide range of sexual interests, acts and perversions, not the least of which include transvestitism, bestiality and mutilation. To say this is not to indicate any opinion as to whether it rises (or falls) to the level of pornography, nor, for that matter, to indicate any opinion at all as to its literary worth. It is merely to point out that given the extremely wide range of freedom that the law guarantees a critic in expressing his opinion about a published work of art, no jury could reasonably find that Buckley's comments about the book were unfair.

This brings us to the final element of plaintiff's defense which is the question whether the comments were an honest expression of plaintiff's real opinion. Basically, this is the issue of malice.

Defendant argues that with an element such a malice, where state of mind is in issue, "it is unusual that disposition may be made by summary judgment." Consolidated Electric Company v. United States, 355 F.2d 437 (9th Cir. 1966).

This is, of course, true as a general rule, but generalizations of this sort do not relieve the courts of their responsibility to decide whether a genuine issue of fact exists. See Washington Post Company v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965, 967 (1966).

As the New York Court of Appeals said recently:

"While there are numerous cases in the books in which it is said that as to privileged communications the good faith of the defendant and the existence of actual malice are questions of fact for the jury, the expression must not be misunderstood. Those questions are for the jury only where there is evidence in the case warranting their submission to the jury, and the burden of proof is on the plaintiff." Shapiro v. Health Ins. Plan, 7 N.Y.2d 56, 61, 194 N.Y.S.2d 509, 513, 163 N.E.2d 333, 336 (1959).

The Second Circuit had occasion to rule on this question quite recently in the case of Goldwater v. Ginzburg, 414 F.2d 324 (2nd Cir. 1969). In that libel suit the court held that denial of summary judgment by the trial court on the issue of malice was quite appropriate. In so holding, however, the court at page 336 pointed to seven distinct elements of proof offered by defendant about which it held there was a genuine dispute as to material fact. Moreover, the court was very careful to distinguish cases such as Thompson v. Evening Star Newspaper Co., 129 U.S.App.D.C. 299, 394 F.2d 774, cert. denied 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968) and Washington Post Company v. Keogh, supra, which stand for the proposition that the courts should liberally grant summary judgment in libel cases such as this in order to give First Amendment freedoms "breathing room." [2] As the court pointed out, those were cases where the non-moving party simply failed to show that a genuine issue of fact existed. [3]

After careful reading of the affidavits and other documents filed in this

2. In the Thompson and Keogh cases, the court was dealing specifically with a First Amendment defense under the rule set forth in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), but the interests to be served by the defense of fair comment parallel those protected under the New York Times rule, and we find the reasoning in those cases persuasive to the issue presented here.

3. In the Thompson case, the non-moving party failed to file affidavits or other papers to refute the moving party's affidavits.

case, we must hold that on the issue of whether the comments by Buckley were an honest expression of plaintiff's real opinion, defendant has raised no genuine issue of material fact and that summary judgment is the appropriate disposition.

Defendant argues that the statement by Buckley which forms the basis of the second counterclaim raises such an issue as to all of the first three counterclaims. Vidal's reference is to Buckley's statement that "Vidal and I awaited the sound of the bell. * * * there and then I resolved in hitting him back hard with a *tu quoque* involving Myra Breckinridge—which I had not yet read, thinking it a pornographic potboiler done for money * * *."

Defendant claims this raises two issues as to malice, the first being whether plaintiff's resolve "to hit defendant with a *tu quoque*" prior to debate indicates some premeditative, malicious state of mind. While this contention at first appears to have some merit, a look at the uncontested facts indicates otherwise. The statement in question was part of a manuscript which was eventually published in Esquire a year after the debates. As is apparent from a reading of the full paragraph from which the quoted passage is taken [4] and of Buckley's affidavit, this statement was made in reference to the August 3, 1968 debate between Buckley and Vidal. The simple fact is that none of Buckley's comments about Myra Breckinridge was made during that appearance. They were made either much later in the month during the debates that were part of the coverage of the Democratic convention, or as part of an article which was written much later.

Still relying on the passage quoted above, defendant argues further that Buckley's statement that he had not read Myra Breckinridge indicates that Buckley's comments were not an honest expression of real opinion. Here, again, chronology is important. Buckley did indeed say that he had not read the novel prior to his August 3 debate. He didn't mention it then, however. He mentioned it during the latter series of debates for the first time, and in his affidavits of October 15, 1970 and April 19, 1971. Buckley affirms that he did in fact read the novel before that second series of debates.

██ Defendant's real contention seems to be that he should be given the chance to raise an issue of malice through his cross-examination of Buckley at trial. The possibility that he might elicit something on cross-examination, when there is no indication of what that might be specifically, cannot defeat a motion for summary judgment. Were it otherwise, summary judgment would cease to exist and courts would have no way of avoiding long and expensive litigation that promises to produce nothing. See United States Steel Corp. v. United States, 305 F.Supp. 497, 502–503 (S.D. N.Y.1969).

Before moving on, it must be pointed out that the statement which forms the basis of the third counterclaim was also a comment upon Vidal's qualifications as a political commentator as well as about his literary work. The privilege of fair comment extends equally—if not more forcefully—to the political arena, and the freedom to attack the competence of one who speaks in that arena was an old and fundamental principal of the law of libel even before New York Times Co. v. Sullivan, supra. See, for example, Julian v. American Business Consultants, supra, and Castle v. Thackrey, 54 N.Y. S.2d 432 (Sup.1945).

██ This brings us to defendant's fourth counterclaim. This involves a letter written by Buckley to the publisher of the New York Review of Books and to publishers of other magazines. The letter asked those publishers to confer with Buckley before publishing a

---

4. The paragraph from which defendant extracted the quotation in question begins as follows: "So there we were, Satur- day, August 3, on duty for our first broadcast * * *."

manuscript of Vidal's which Buckley felt was damaging to his reputation. Vidal claims that this letter by Buckley was libelous in that it accused Vidal of disseminating defamatory material. See, for example, Harrison v. Winchell, 207 Misc. 275, 137 N.Y.S.2d 82 (1955).

In defense of this charge Buckley raises the privilege of protecting one's own reputation from the threat of defamation. Stillman v. Ford, 22 N.Y.2d 48, 290 N.Y.S.2d 893, 238 N.E.2d 304 (1968); Shapiro v. Health Ins. Plan, supra; I Harper and James, The Law of Torts, § 5.26 at p. 445. Here again we are dealing with a qualified privilege and the question on this motion for summary judgment is whether there is a sufficient issue of fact as to malice to send the matter to the jury.

The malice issue resolves itself into two questions—was it reasonable for Buckley to believe that his interest in his own reputation had been unlawfully invaded by Vidal, and was the letter which he published in response thereto reasonably necessary to defend himself. See Restatement of Torts (1938 ed.) § 594, Comment (i).

As to the first of these questions we must look, inter alia, to the manuscripts of Vidal's article. The manuscripts dealt with Vidal's impressions of the television encounters between Buckley and himself and with Vidal's impressions of Buckley generally. The manuscripts were not particularly generous in their treatment of the latter subject.

Among other things, the manuscripts alleged that, during Buckley's childhood, three of the Buckley children vandalized a church in Sharon, Connecticut because the wife of the church rector had sold a house to a Jewish family. At least one version of the manuscripts also alleges that a favorite prank of the Buckley children during the war years was "to go out at night on the lake and, just opposite a Lakeville Jewish camp, light canvas covered swastikas drenched in gasoline."

Without making any determination as to whether or not this material rises to the level of libel, we must nonetheless rule that a person about whom such things are written might reasonably believe that the dissemination of such material would seriously harm his reputation.

Vidal, in response, has submitted certain documents which he claims bear out the truth of the allegations above. Truth is, of course, a defense to any libel action, but the question before us is not whether Vidal's words are legally actionable. Such a finding is unnecessary. The privilege arises if the words can reasonably be considered damaging to the reputation of the party who invokes the privilege. Thus, the only real fact issue which Vidal has raised as to this first element of the privilege is irrelevant.

This brings us to the reasonableness of the response itself. Here, we find the tenor of the letter itself to be very important. The letter merely requests that the publisher to whom it was directed consult with Buckley before publishing a manuscript which he (Buckley) felt to be injurious to his reputation. There is nothing in either the content or the tone of the letter which could possibly suggest, as Vidal contends, that Buckley's intent here was one of "poisoning and closing the available publishing markets of defendant as an author and essayist, and so ruining him economically." (Defendant's menorandum of law in opposition to plaintiff's motion, p. 25).

Moreover, it is clear from the affidavits that Buckley had been told by his prior counsel in the case that Esquire's legal counsel, Mr. Harold Medina, was of the opinion that Vidal planned to submit his article to other magazines in order to find a forum to reply to Buckley's earlier article.

Buckley's letter was a tempered and reasoned response—one of the very few in the sad catalogue of events that led to this litigation—which constituted an ap-

propriate reaction by Buckley to a situation which seemed to threaten his reputation. Vidal has raised no fact issue which could lead a jury to find otherwise.

Plaintiff's motion to dismiss defendant's four counterclaims is granted.

Settle order upon notice.