**Mary Anne GUITAR, Plaintiff,**

v.

**WESTINGHOUSE ELECTRIC CORPO-RATION et al., Defendants.**

**Nos. 73 Civ. 161, 73 Civ. 5287.**

United States District Court,
S. D. New York.
June 17, 1975.

Windels & Marx, New York City by Robert P. Knapp, Jr., Francis E. Koch, J. Dennis McGrath, New York City, for plaintiff.

Townley, Updike, Carter & Rodgers, New York City by James W. Rodgers, John J. Macchia, Esq., Raymond J. Soffientini, New York City, for defendants Westinghouse Electric Corporation, Westinghouse Broadcasting Co., Inc. (Del.) and H. Paul Jeffers.

Nicholas A. D'Onofrio, New York City, for defendants Robert Martin Corp., Robert Weinberg and Martin Berger.

Mitchell, Mina & Madison, New York City by F. V. Mina, New York City, for defendants Margaret Migliore Schneider and Gerald David Lloyd.

Cerchiara & Cerchiara, Mount Vernon, by Vincent F. Cerchiara, Mount Vernon, N. Y., for defendant John Yottes.

## OPINION

ROBERT L. CARTER, District Judge.

This action was commenced in early 1973 alleging defamation and a conspiracy to violate certain sections of the Communications Act of 1934, as amended. A second action, consolidated with the principal one, contains similar claims.[1] Jurisdiction is asserted under 28 U.S.C. §§ 1331, 1332.

### Parties

Plaintiff is a free-lance writer residing in Connecticut. Defendant Westinghouse Broadcasting Co., Inc. (Del.) ("Broadcasting") owns and is the licensee of radio station WINS in New York City. Broadcasting is a wholly-owned subsidiary of Westinghouse Broadcasting Co., Inc. (Ind.), an Indiana corporation which in turn is a wholly-owned subsidiary of defendant Westinghouse Electric Corporation ("Electric"). Defendant H. Paul Jeffers was a full-time news editor employed by WINS. Defendant John Yottes was a "some time casual" employee at WINS prior to December 3, 1972, and subsequent to February 2, 1973. Defendant Robert Martin Corporation is a New York corporation engaged in the construction and development of a real estate project in Westchester known as Tarrygreen. Defendant Martin Berger is its president; defendant Robert Weinberg is its chairman of the board; defendant Gerald David Lloyd (in the second action) is its vice president; and defendant Margaret Migliore Schneider (in the second action) is its employee.

### Factual Background

On December 17, 1972, WINS broadcast a review by Jeffers of a book written by plaintiff entitled "Property Power." The review stated:

"The hope of a lot of city dwellers is to find a place in the suburbs or the country with trees and green grass and clean air. Indeed, that 'better life' has long been part of the so-called American dream. But, as you may have noticed, some suburbanites are not too eager to have city folk moving in. An article in yesterday's Times describes resistance in New England to new home building. This suburban resistance is the subject of a book by Mary Anne Guitar, who is neither a city planner nor an architect, but rather a writer about homes and conservation. Her book is PROPERTY POWER. It amounts to a handbook on how to keep others out. Not just the businesses which have been looking to relocate in the suburbs, but also people. Mary Anne Guitar recommends an amazing arsenal of weapons to keep the suburbs pure—law suits, the ballot box, tax-payer petitions, and many, many other devices. The battle cry seems to be 'keep the others out.' People become secondary to trees and space . . . especially if the people are new comers. PROPERTY POWER denounces progress even if it means decent, livable homes for people. PROPERTY POWER says the rose covered cottage in the country is okay for those who got there first but must be off-limits to those who now would like to breathe some of that fresh country air. The author of PROPERTY POWER lives in Redding, Connecticut and has been busy there

1. The original complaint was filed in January of 1973. An amended complaint adding defendant Yottes was filed in February. A second amended complaint, changing the corporate designation of defendant Westinghouse Broadcasting Co., was filed in June of 1973, and is the subject of the instant action. A second action was initiated against defendants Schneider and Lloyd in late 1973; by order of this court dated April 15, 1974, the two actions were consolidated.

keeping HER piece of New England 'clean and green', as it says in her author's biography. Yet Mary Anne Guitar is not a native New Englander. She was born in Missouri. One wonders where she would be living now if someone in Redding had decided to invoke property power in the 1950's when Miss Guitar wanted to move into town. What bothers me about PROPERTY POWER is the seeming hypocrisy of it. On one hand the author writes, 'most of us simply want to live on the land.' Then she proceeds to write a book telling how to keep 'most of us' from doing so. Published by Doubleday at $6.95, Mary Anne Guitar's PROPERTY POWER is a blueprint for exclusion . . . and, if followed, I'm afraid it's a blueprint for stagnation in the suburbs. I'm H. Paul Jeffers."

*Property Power* [2] had been published by Doubleday in June of 1972. Prior to the *Property Power* review Jeffers had broadcast sixty other reviews over WINS, written eight books and produced several records.

On December 15, 1972, Jeffers read an article appearing on the front page of *The New York Times* entitled "New England Resists Land Development Pressures." According to Jeffers, he decided that a review of plaintiff's book would be "pertinent and timely." Affidavit of Jeffers, ¶ 3. The review was prepared and recorded on December 16, and broadcast the next day.

On December 13, 1972, a meeting at which plaintiff was a principal speaker was held by the Save Irvington Committee, an organization formed for the purpose of expressing and organizing opposition to the rezoning needed for the construction of Tarrygreen. Berger directed that Schneider and Lloyd attend this meeting, takes notes, and report their observations to him.

Yottes, who had been hired by Robert Martin Corporation to perform public relations work and services with respect to the development of Tarrygreen, taped a rebroadcast of the Jeffers' review, and gave a transcript of it to either Berger or Weinberg. In order to promote the acceptance of Tarrygreen, Berger reprinted and distributed the review, along with an additional portion entitled "Ms. Guitar quotes," [3] at a public hearing on rezoning on December 20, 1972.

2. The actual title of the book is a subject of dispute. Plaintiff's formulation of the title is *Property Power, How To Keep The Bulldozer, The Power Line, And The Highwaymen Away from Your Door.*

3. The printed reproduction of the broadcast and the additional "Ms. Guitar quotes" portion is as follows:
PROPERTY POWER by Mary Anne Guitar Review by H. Paul Jeffers, WINS, of "Property Power" by M. A. Guitar Broadcast, Sunday, December 17, 1972.
"The hope of a lot of city dwellers is to find a place in the suburbs or the country with trees and green grass and clean air. Indeed, that 'better life' has long been part of the so-called American dream. But, as you may have noticed, some suburbanites are not too eager to have city folk moving in. An article in yesterday's Times describes resistance in New England to new home building. This suburban resistance is the subject of a book by Mary Anne Guitar, who is neither a

city planner nor an architect, but rather a writer about homes and conservation. Her book is PROPERTY POWER. It amounts to a handbook on how to keep others out. Not just the businesses which have been looking to relocate in the suburbs, but also people. Mary Anne Guitar recommends an amazing arsenal of weapons to keep the suburbs pure— law suits, the ballot box, tax-payer petitions, and many, many other devices. The battle cry seems to be 'keep the others out.' People become secondary to trees and space . . . especially if the people are newcomers. PROPERTY POWER denounces progress even if it means decent, livable homes for people. PROPERTY POWER says the rose covered cottage in the country is okay for those who got there first but must be off-limits to those who now would like to breathe some of that fresh air. The author of PROPERTY POWER lives in Redding, Connecticut and has been busy there keeping HER piece of New England 'clean and green', as it says in her author's biography. Yet

Stopc'llelsen

The "Ms. Guitar quotes" was apparently culled from *Property Power*, from the notes taken at the December 13 meeting, and from a magazine article which referred to plaintiff and her writings.

*Contentions of the Parties*

In the second amended complaint plaintiff asserts, as a first cause of action, a claim of defamation against the Robert Martin Corporation, Weinberg, Berger and Yottes based on the republication of the Jeffers' review and the "Ms. Guitar quotes" addition; as a second cause of action, a claim of defamation against Electric, Broadcasting, Jeffers and Yottes based on the original broadcast; and, as a third cause of action, a claim of conspiracy by all defendants to violate various sections of the Federal Communications Act. In the second action against Schneider and Lloyd, plaintiff asserts a claim of defamation based on the republication of the review and a claim based on the same conspiracy. The *ad damnum* clauses in the two actions are identical, demanding two million dollars in compensatory damages and three million dollars in punitive damages, together with costs and disbursements.

All defendants move for summary judgment pursuant to Rule 56, F.R.Civ. P., on the same grounds: (1) as to the defamation claims, that the publications are not libelous on their face, and hence are not actionable as a matter of law; that the publications are critical reviews and comment, protected by the fair comment privilege; or that the publications are protected by a constitutional privilege; (2) as to the conspiracy claims, that no private right of action exists for alleged violations of the Communications Act of 1934.

*Discussion*

■ A comparison of the parties' 9(g) statements, submitted in accordance with local rule, reveals, at best, that only immaterial facts are in dispute. Accordingly, the motions for summary judgment are well pleaded. *See American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972); *Empire Electronics Co. v. United States*, 311 F.2d 175, 180 (2d Cir. 1962).

*The Defamation Claims*

■ While the law of libel is a limitation on the right of citizenry to speak or write freely, it "recognizes fair comment as a complete defense to a charge of a libelous publication." *Julian v. American Business Consultants, Inc.*, 2 N.Y.2d 1, 7, 155 N.Y.S. 2d 1, 7, 137 N.E.2d 1, 5 (1956).[4]

Mary Anne Guitar is not a native New Englander. She was born in Missouri. One wonders where she would be living now if someone in Redding had decided to invoke property power in the 1950's when Miss Guitar wanted to move into town. What bothers me about PROPERTY POWER is the hypocrisy of it. On one hand the author writes, 'most of us simply want to live on the land.' Then she proceeds to write a book telling how to keep 'most of us' from doing so. Published by Doubleday at $6.95, Mary Anne Guitar's PROPERTY POWER is a blueprint for exclusion . . . and, if followed, a blueprint for stagnation in the suburbs. I'm H. Paul Jeffers."

Ms. Guitar quotes:

"My role is to make you feel less guilty about wanting to preserve your wooded boundaries and keep all newcomers out at all costs"

"City people should be made to stay in the city"

"The City should not be robbed of its livelihood by enticing industry to the suburbs"

"I would be happy to throw sand in the wheels of progress".

4. This is a long-established principle. In Carr v. Hood, 1 Campb. 354, 357 (1808), defendant critically reviewed plaintiff's works and plaintiff claimed defamation. The court found for defendant, holding that the review was directed not at plaintiff personally, but rather at his work:

"We really must not cramp observations upon authors and their works. They should be liable to criticism, to exposure, and even to ridicule, if their compositions be ridiculous; otherwise the first who writes a book on any subject will maintain a monopoly of senti-

When an author submits his work to the public, "he [is] bound to expect, with equal equanimity, praise or blame directed at the work itself." *Berg v. Printers' Ink Publishing Co.*, 54 F.Supp. 795, 797 (S.D.N.Y.1943), *aff'd on opinion below*, 141 F.2d 1022 (2d Cir. 1944). The author invites criticism, "and no matter how hostile such criticism may be, the critic enjoys a privilege to make such critical comments as long as the comment does not go beyond the published work itself to attack the author personally," *Buckley v. Vidal*, 327 F.Supp. 1051, 1052–53 (S.D.N.Y. 1971); *Berg, supra; Triggs v. Sun Printing and Publishing Ass'n*, 179 N. Y. 144, 71 N.E. 739 (1904); the facts are truly stated, *Berg, supra;* the comment is fair, *Buckley, supra; Berg, supra; Triggs, supra;* and the comment is an honest expression of the writer's real opinion, *Buckley, supra; Briarcliff Lodge Hotel v. Citizen-Sentinel Publishers, Inc.*, 260 N.Y. 106, 183 N.E. 193 (1932).

By publishing *Property Power* and other articles, and appearing and speaking at public meetings, plaintiff had to expect public attention. The assertion that the review and its subsequent republication with the "Ms. Guitar quotes" addition was an attack on her personally is groundless, "except so far as any criticism of a work of art must necessarily imply a criticism of its author. . . . [S]uch necessary implications of comments directed at the work itself are not sufficient to turn otherwise protected criticism into unprotected criticism." *Buckley, supra,* 327 F.Supp. at 1053. "Such criticism usually implies some criticism of the author; and though his private character is no more subject to attack than another's, the qualities which he has shown by what he has published are open to such analysis and comment as an honest and intelligent man might make." *See Berg, supra,* 54 F.Supp. at 797.[5]

■ The requirement that the facts be truly stated is not applicable to the disputed review, since those portions alleged to be defamatory are not statements of fact. Rather, they can only be characterized as expressions of opinion.[6]

ment and opinions respecting it. This would tend to perpetuity of error. Show me an attack on the moral character of this plaintiff, or any attack upon his character unconnected with his authorship and I shall be as ready as any judge who ever sat here to protect him, but I cannot hear of malice on account of turning his works into ridicule."

5. The phrase "seeming hypocrisy" is a comment referring to the book's content; it is not aimed personally at plaintiff. *Compare* Corrigan v. Bobbs-Merrill Co., 228 N.Y. 58, 126 N.E. 260 (1920); McKee v. Robert, 197 App.Div. 842, 189 N.Y.S. 502 (3d Dep't 1921); Levey v. Brooklyn Union Publishing Co., 65 Misc. 373, 121 N.Y.S. 643 (Sup.Ct. 1909), *aff'd,* 137 App.Div. 947, 123 N.Y.S. 1126 (1st Dep't 1910), *aff'd,* 202 N.Y. 555, 95 N.E. 1132 (1911), where the criticisms were personal attacks on a plaintiff's reputation.

6. Plaintiff's affidavit claims the following statements in the review are defamatory:
　(a) "Her book is Property Power. It amounts to a handbook on how to keep others out."

　(b) "The battle cry seems to be 'keep the others out.' People become secondary to trees and space . . . especially if the people are newcomers."

　(c) "Property Power renounces progress even if it means decent livable homes for people."

　(d) "Property Power says the rose covered cottage in the country is okay for those who got there first but must be offlimits to those who now would like to breathe some of that fresh air."

　(e) "What bothers me about Property Power is the seeming hypocrisy of it."

　(f) "On one hand the author writes, 'most of us simply want to live on the land.' Then she proceeds to write a book telling how to keep 'most of us' from doing so * * * Mary Anne Guitar's *Property Power* is a blueprint for exclusion . . . and, if followed, I'm afraid it's a blueprint for stagnation in the suburbs."

Affidavit of Guitar, ¶ 26.

The claim that the full title of the book was intentionally omitted for the purpose of misrepresenting its true nature and content is specious. First, it is not all clear that the phrase "How to Keep the Bulldozer, The Power Line, and the Highwaymen Away From Your Door" is actually part of the title. *Property Power* is the only title printed on the hardcover, inside page, page following the preface, and side, back and inside cover of the jacket. The "How to" portion is printed on the face of the jacket, and on the title page, but not in any manner which clearly indicates that it is a part of the title[7]. Second, the cases cited by plaintiff to support the assertion that the publication misrepresented the nature of the book are inapposite; in those cases defamation was found where a publication was falsely stated to have been written by the plaintiff and where the publication itself held plaintiff up to ridicule and contempt or injured him in his professional reputation. *See Ben-Oliel v. Press Publishing Co.*, 251 N.Y. 250, 167 N.E. 432 (1929); *D'Altomonte v. New York Herald Co.*, 154 App.Div. 453, 139 N.Y.S. 200 (1st Dep't), *modified without opinion*, 208 N.Y. 596, 102 N.E.

7. The book jacket reads, transcribed as accurately as possible:

P R O P E R T Y
P O W E R

MARY ANNE GUITAR

HOW TO KEEP THE BULLDOZER,
THE POWER LINE, AND
THE HIGHWAYMEN
AWAY FROM YOUR DOOR

Preserve property values · Stabilize your taxes · Keep your community clean and green · Set up a land trust, and Save your piece of America

The title page reads:
PROPERTY
POWER

---

How to Keep
the Bulldozer, the Power Line,
and the Highwaymen
Away from Your Door

---

MARY ANNE GUITAR

The only indication that the "How to" phrase is a formal part of the title is the way it is printed on the page containing titles of books written by plaintiff. There, a colon sets off the two portions. However, it is unreasonable to assume that any reader would or should look further than the bookcover, jacket or title page to discover the true title.

1101 (1913); *Clevenger v. Baker Voorhis & Co.*, 8 N.Y.2d 187, 203 N.Y.S.2d 812, 168 N.E.2d 643 (1960); *Carroll v. Paramount Pictures, Inc.*, 3 F.R.D. 95 (S.D.N.Y.1942).

The "Ms. Guitar quotes" addition [8] presents some difficulty since that phrase does imply that the "quotes" are actual and accurate quotations. However, the "quotes" come substantially from the book, from statements made by plaintiff in public meetings, and from a magazine article referring to plaintiff's writings.[9] Thus the requirement that the facts be "truly stated" is met. That the "quotes" are not word-for-word—indeed they are modified on occasion—nor always complete, does not make them facts not "truly stated." As the New York Court of Appeals said in *Briarcliff Lodge Hotel, supra:*

"And a fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated. . . . Mere exaggeration, slight irony, or wit, or all those delightful touches of style . . . do not push beyond the limitations of fair comment. Facts do not cease to be facts because they are mixed with the fair and expectant comment of the story teller, who adds to the recital a little touch by his piquant pen." 260 N.Y. at 118–19, 183 N.E. at 197.[10]

As to the essential that the comment be fair, the New York Court of Appeals has stated:

"The comment must be fair. It must be a reasonable inference from the facts truly stated. . . . We have held that even in the absence of admis-

8. Plaintiff only attacks these three of the four "quotes" as defamatory:
[a] "My role is to make you feel less guilty about wanting to preserve your wooded boundaries and keep all newcomers out at all costs"
[b] "City people should be made to stay in the city"
[d] "I would be happy to throw sand in the wheels of progress"
Second amended complaint, ¶ 25.
Plaintiff does assert that the fourth—[c] "The City should not be robbed of its livelihood by enticing industry to the suburbs"—was never expressly stated in those words, but that it does accurately represent her belief and public expressions regarding that matter. *Ibid.*

9. Martin Berger, who prepared the "quotes", testified during deposition that the source for the [a] and [b] quotes were the notes of the meeting of the Save Irvington Committee on December 13. Those notes, Exhibit L to plaintiff's affidavit, include the following direct quotes of plaintiff:
"I consider my role to be to do a little consciousness raising to make you all feel less guilty. When you bought you bought more than a house you bought an environment and you are entitled to it. This tract is the last piece of green you have. You must preserve it at all costs. Don't feel guilty—don't let them make you feel guilty."
"You must preserve the greenry. We have to think of yourselves and the next generation . . . ." "We should keep the plants in the cities. Everybody would be

better off. We can be the green belts for the denser areas. Let's not move the city to the country."
Furthermore, the book itself substantiates to a large degree the position attributed to plaintiff that the rural and exurban areas should discourage the influx of new population. See *infra.*
Berger further testified that the third "quote"—[c]—was supported by the book itself, at page 264:
"Is it fair, or even defensible, to rob the city of its livelihood by enticing industry to the suburbs?"
"The answer is no."
Berger also testified that the source of the fourth "quote"—[d]—is found in a June, 1972, article in *Mademoiselle* magazine, entitled "An Insider's Guide For the Political Innocent," by plaintiff, on page five:
"I had been a strong advocate of land preservation, been vocally opposed to 'mindless growth' and left little doubt, that, if elected, I would be happy to throw sand in the wheels of 'progress'." Plaintiff's affidavit, Exhibit M thereto.

10. Plaintiff's contention that the republication of the book review contains "significant variations" from the original review, Plaintiff's Memorandum at 10, is untenable. The three variations—the omission of "country" from "fresh country air," the omission of "seeming" from "seeming hypocrisy," and the omission of "I'm afraid it's" from "I'm afraid it's a blueprint"—are *not so significant* as to require a second "fair comment" analysis of the republication.

sion as to the truth of the facts, it is sufficient if the facts form a reasonable basis for inference and the comment connected with the facts. . . . Under the rule of fair comment even if the publication holds one up to public ridicule, contempt and reproach or prejudices one in his opportunity to earn a living, nevertheless it is not actionable if facts form a reasonable basis of inference." *Julian, supra,* 2 N.Y.2d at 7–9, 155 N.Y.S.2d at 7–9, 137 N.E.2d at 5.

Courts in this district have clearly indicated, in judging fair comment, that "the latitude allowed the critic in this area is quite large." *Buckley, supra,* 327 F.Supp. at 1053. In *Berg,* the court held:

> "The criticism need not express an opinion with which any person of reasonable intelligence and judgment could possibly agree. Unlike a personal attack upon a public man, the fact that the comment or criticism is one which is not reasonably warranted by the facts upon which it is based or is fantastic or extravagant, is immaterial. If the public is to be aided in forming its judgment upon matters of public interest by a free inter-

change of opinion, it is essential that honest criticism and comment, no matter how foolish or prejudiced, be privileged." 54 F.Supp. at 797.

More recently, the court in *Buckley* added the gloss "whether [the] comments are so obviously without basis in fact as to be adjudged unfair or dishonest." 327 F.Supp. at 1054. Thus the challenged portions of the review must be measured against the content of the book.

■ *Property Power* describes the various tools which can be successfully utilized to keep land developers, utilities, and highways "away from your door"; the door generally being the rural and suburban areas which ring the cities. Essentially it deals with means of preventing or curbing unrestrained growth and development to the detriment of the homeowner, property owner, and community. The evils to be battled include unregulated growth in housing, population and industry. A necessary result of the implementation of land trusts, land use controls and open space programs is the unavailability of land for newcomers; in this sense the book does advocate "keeping others out," and specific passages support Jeffers' comments and opinions,[11] though his opinions need not

11. The following passages in plaintiff's book do not unreasonably lend themselves to the interpretation that one of the author's goals is to limit the immigration of "newcomers" into rural and suburban communities:

"Ever since World War II, the green acres which rim urban centers have been invaded by families seeking elbow room. As they crowd in upon the land the very thing which attracted them, that 'country atmosphere,' begins to disappear." (at 62); "The most recent poll . . . demonstrated that Redding valued its 'country atmosphere' and wanted to protect it by buying open land, holding residential zoning at two-acre density, giving preferential tax treatment to owners of large tracts." (at 63); "What about the economic-environmental-social impact of industry? It would surely stimulate population growth as well, with attendant school costs and town services." (at 83); "Giant companies are searching for a spot to locate their suburban/exurban offices and plants. Resort developers are planning vast new vacation complexes. 'New towns' and

retirement villages are on the drawing boards. The only problem is finding a place to put them." (at 88); "Overnight they develop a social conscience and wonder piously about the young couples who won't be able to build modest houses if land is zoned for large lots. There is little concern for the people who paid their own hard cash for a place they thought would be decently preserved." (at 92); "Before long your uncrowded, unpolluted paradise will be overwhelmed with three thousand new households." (at 96–97); "The individual who buys a single summer cottage doesn't create severe problems, but multiply him by hundreds and you put a heavy load on sewers and water supply." (at 98); "Every town would like to have an industry assessed at three million dollars, which builds its plant underground and has three employees. But what it gets is a plant with people—people who need to be housed and schooled and transported." (at 105); "If our town's growth had stopped ten years ago, how many of you would be here now? This question was asked at a town meeting

be any with "which any person of reasonable intelligence and judgment could possibly agree." *Berg, supra,* 54 F.Supp. at 797. As a matter of law I find that the review is a reasonable comment on the content of the book, and is fair.[12]

The final element to be considered is whether the comment is an honest expression of the writer's real opinion. Essentially, this raises the issue of malice, which, if found, vitiates the privilege of fair comment. *Briarcliff Lodge Hotel, supra; Hoeppner v. Dunkirk Printing Co.,* 254 N.Y. 95, 172 N.E. 139 (1930); *Goldwater v. Ginzburg,* 261 F.Supp. 784 (S.D.N.Y.1966), *aff'd,* 414 F.2d 324 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970).

Contrary to plaintiff's allegation of malice, a careful reading of the affidavits, depositions and exhibits filed here show that plaintiff has not raised a disputed genuine issue of material fact as to malice. In opposing a motion for summary judgment, plaintiff has the burden of producing specific facts, admissible in evidence, which show that there is a genuine issue for trial.[13]

Though complete and exhaustive depositions have been taken, plaintiff has not satisfied that burden. Instead, plaintiff has come forward with only

unsupported speculation, opinion and surmise—none of which is sufficient to defeat a well-grounded motion for summary judgment. *Daily Press, Inc. v. United Press International,* 412 F.2d 126, 134 (6th Cir.), *cert. denied,* 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); *Wilson Jones Co. v. Gilbert & Bennett Manufacturing Co.,* 332 F.2d 216, 219 (2d Cir. 1964); *Meeropol v. Nizer,* 381 F.Supp. 29, 32, 35 (S.D.N.Y.1974); *Koningsberg v. Time, Inc.,* 312 F.Supp. 848, 853–54 (S.D.N.Y.1970); *Flintkote Co. v. United States,* 47 F.R.D. 322, 324 (S.D.N.Y.1969), *cert. denied,* 402 U.S. 944, 91 S.Ct. 1619, 29 L.Ed.2d 112 (1971). Some of the more egregious assertions in plaintiff's affidavit include the following: that Jeffers is not a bona fide book reviewer because he buys his books rather than receiving them free from publishers, Guitar affidavit, ¶¶ 37, 38; that Jeffers was promoting books for publishers, rather than being a legitimate reviewer, because only eight of sixty-five books reviewed were on bestseller lists and because he utilized taped material which "had to have come from the publishers," *Id.* ¶¶ 39–41; that Jeffers did not review books on their merits because only one other book, in addition to *Property Power,* was published by Doubleday, while three other reviews in a one-month period concerned books of a

---

called to hear the proposal of a big-time developer. Some of those within earshot might have felt a twinge of guilt at having slipped in while the door was open. But most of the audience was probably thinking, 'Thank God, I'm here. I had the good sense to move in. And I'm going to make sure that what I worked for and saved for and slaved over isn't going to disappear.' Selfish? So is any investor . . . .. So why is the biggest investment a family is likely to make in its whole lifetime—its house and property—not worth defending?" (At 259–60).

12. The *"Ms. Guitar quotes"* addition is similarly fair comment. See n. 9 *supra.*

13. Rule 56(e) provides:
"(e) Form of Affidavits; Further Testimony; Defense Required.
Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Rule 56(e), F.R.Civ.P.

smaller publisher, *Id.* ¶ 42; that if Jeffers would take "payola" to promote books, he would take "payola" to hurt plaintiff, *Id.* ¶ 41; and that the Jeffers' review was initiated by one of the Robert Martin defendants, though whether "Jeffers was paid for his fake 'book review' or whether he did it as a favor for Yottes, I do not and cannot know." *Id.* ¶ 46.[14]

Defendants are entitled to summary judgment where the alleged defamation constitutes fair comment and plaintiff fails to set forth evidentiary facts, which would warrant a trial, to support the allegations that defendants were motivated by malice. *Cole Fisher Rogow, Inc. v. Carl Alley, Inc.*, 25 N.Y.2d 943, 945, 305 N.Y.S.2d 154, 155, 252 N.E.2d 663 (1969). Summary judgment is not defeated by charges based upon surmise, conjecture and suspicion, *Shapiro v. Health Insurance Plan of Greater New York*, 7 N.Y.2d 56, 62, 194 N.Y.S.2d 509, 515, 163 N.E.2d 333 (1959); *Trails West, Inc. v. Wolff*, 32 N.Y.2d 207, 221, 344 N.Y.S.2d 863, 873–74, 298 N.E.2d 52 (1973); particularly where there has been full opportunity for discovery, *Stillman v. Stillman*, 22 N.Y.2d 48, 54, 290 N.Y.S.2d 893, 898, 238 N.E.2d 304 (1968); *see also Modern*

*Home Institute, Inc. v. Hartford Accident and Indemnity Co.*, 513 F.2d 102, 109–110 (2d Cir., 1975).

The "rule" that summary judgment should be reluctantly granted where state of mind is at issue should not dissuade the court from its duty to grant such relief where no material fact issue exists [15], *see, e. g., Washington Post Co. v. Keogh*, 125 U.S.App.D.C. 32, 365 F.2d 965, 967–68 (1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); the question of malice is for the jury only when evidence exists warranting that issue's submission to that body, *Shapiro, supra*, 7 N.Y.2d at 60, 194 N.Y. S.2d at 513, 163 N.E.2d 333; *Buckley, supra*, 327 F.Supp. at 1054. The mere hope of putting defendants' witnesses' credibility in issue at trial is not enough to withstand a motion for summary judgment. *Koningsberg, supra*, 312 F. Supp. at 853; *Hurley v. Northwest Publications, Inc.*, 273 F.Supp. 967, 974 (D. Minn.1967), *aff'd on opinion below*, 398 F.2d 346 (8th Cir. 1968); *Trails West, supra*, 32 N.Y.2d at 221, 344 N.Y.S.2d at 873, 298 N.E.2d 52; *Buckley, supra*, 327 F.Supp. at 1055. Moreover, because of the importance of free speech, summary judgment *is* the "rule," and not the exception, in defamation cases.[16]

14. Other affidavits submitted in opposition to the motion are similarly infirm. The Applebaum affidavit is based on hearsay and opinion, and is conclusory and argumentative. The Harris and Delph affidavits, purporting to show the general practice in the publishing field of distributing new books free to reviewers, is irrelevant. The Kanefsky and Winnick affidavits, prepared by para-legal assistants in plaintiff's counsel's law firm, contain transcripts of more than sixty book reviews broadcast by Jeffers, publication dates of the books reviewed, and the ostensible impetus for each review; they are asserted to show both a purported untimeliness of the *Property Power* review and the general absence of "personal attacks" on the authors. As discussed *supra*, the *Property Power* review was not a personal attack on the author; the assertion that the review was untimely is contradicted by the specific impetus of the review—the *Time's* article—and is supported only by an artificial determination that only

books reviewed within six months of their publishing date are "new."

15. Plaintiff's 9(g) statement in opposition is replete with conclusory allegations lifted from the second amended complaint, legal conclusions properly determinable by the court, and recitals from certain of defendants' defenses. The 9(g) statement is also violative of Rule 56(e). *Flintkote Co. v. United States*, 47 F.R.D. 322, 324 (S.D.N.Y.1969), *cert. denied*, 402 U.S. 944, 91 S.Ct. 1619, 29 L.Ed. 2d 112 (1971).

16. *See, e. g., Perry v. Columbia Broadcasting System, Inc.*, 499 F.2d 797 (7th Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed. 2d 123 (1974); *Cervantes v. Time, Inc.*, 464 F.2d 986 (8th Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); *Miller v. News Syndicate Co.*, 445 F.2d 356 (2d Cir. 1971); *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858 (5th Cir. 1970); *Time, Inc. v. McLaney*, 406 F.2d

The two cases proffered by plaintiff as support for the inappropriateness of summary judgment are inapplicable here. In both *Goldwater, supra,* and *Guam Federation of Teachers v. Ysrael,* 492 F.2d 438 (9th Cir. 1974), the courts took care to note that ordinarily the grant of summary judgment in defamation cases is necessary to protect First Amendment rights, 414 F.2d at 337 n. 21; 492 F.2d at 441. In *Goldwater,* the Second Circuit emphasized the proof from which a jury could infer malice, 414 F.2d at 336–37; in *Guam,* the Ninth Circuit reversed a directed verdict for defendant, finding that the lower court erred in passing on the credibility of witnesses and for choosing among competing legitimate inferences, 492 F.2d at 441. Here, no proof has been presented from which a jury could infer malice; nor are there any competing *legitimate* inferences that could properly be drawn in plaintiff's favor.

 Whether proof of actual malice exists is an issue for the court to decide on a motion for summary judgment; a showing of malice may not be presumed but must be proved. *Fram v. Yellow Cab Co.,* 380 F.Supp. 1314, 1335 (W.D.Pa.1974). Plaintiff has not satisfied this burden; accordingly summary judgment as to the defamation claims is granted to all defendants.[17]

 Constitutional considerations mandate the same result. It seems clear that Ms. Guitar is a "public figure" within the meaning of *Gertz v. Robert Welch,*

*Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed. 2d 789 (1974):

> "For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. . . . More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. . . . [T]hey invite attention and comment." *Id.* at 345, 94 S.Ct. at 3009.

Plaintiff would thus have to prove with convincing clarity that the alleged libelous review and republication were made with "malice," that is, with knowledge of their falsity or with reckless disregard for the truth or falsity of the review and republication. *Id.* at 342. Since plaintiff has presented no evidence giving rise to an issue of fact as to whether malice actually existed, summary judgment as to the defamation counts is granted on First Amendment grounds as well. *See, e. g., Thompson v. Evening Star Newspaper Co.,* 129 U.S. App.D.C. 299, 394 F.2d 774, 776, *cert. denied,* 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968); *Hurley, supra,* 273 F.Supp. at 974; *Koningsberg, supra,* 312 F.Supp. at 853; *Trails West, supra,* 32 N.Y.2d at 221, 344 N.Y.S.2d at 873, 298 N.E.2d 52.

*Conspiracy to Violate the Communications Act*

The third cause of action is premised on a purported conspiracy to violate

565 (5th Cir.), *cert. denied,* 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969); Thompson v. Evening Star Newspaper Co., 129 U.S. App.D.C. 299, 394 F.2d 774, *cert. denied,* 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968); Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); Meeropol v. Nizer, 381 F.Supp. 29, 32 (S.D.N.Y.1974).

17. Plaintiff suggests that Buckley v. Littell, 70 Civ. 2844 (S.D.N.Y., May 23, 1975) requires denial of summary judgment. In that case the court found that passages in defend-

ant's book which referred to plaintiff as a facist or facist fellow-traveler were libelous *per se,* and that in addition defendant failed to establish the fair comment defense. That decision is inapplicable here, since defendants have successfully interposed that defense. Whether the review and republication were defamatory is merely an academic exercise, since fair comment constitutes a complete defense to defamation. Julian v. American Business Consultants, Inc., 2 N.Y.2d 1, 155 N.Y.S.2d 1, 137 N.E.2d 1 (1956); Cole Fisher Rogow, Inc. v. Carl Alley, Inc., 25 N.Y.2d 943, 305 N.Y.S.2d 154, 252 N.E.2d 663 (1969).

47 U.S.C. §§ 317, 501, 502, 503, and 508 of the Federal Communications Act of 1934, as amended.[18] The basis for motions in respect of this claim is that

18. Section 317 provides:

Announcement of payment for broadcast—
Disclosure of person furnishing

"(a)(1) All matter broadcast by any radio station for which any money, service or other valuable consideration is directly or indirectly paid, or promised to or charged or accepted by, the station so broadcasting, from any person, shall, at the time the same is so broadcast, be announced as paid for or furnished, as the case may be, by such person: *Provided*, That "service or other valuable consideration" shall not include any service or property furnished without charge or at a nominal charge for use on, or in connection with, a broadcast unless it is so furnished in consideration for an identification in a broadcast of any person, product, service, trademark, or brand name beyond an identification which is reasonably related to the use of such service or property on the broadcast.

"(2) Nothing in this section shall preclude the Commission from requiring that an appropriate announcement shall be made at the time of the broadcast in the case of any political program or any program involving the discussion of any controversial issue for which any films, records, transcriptions, talent, scripts, or other material or service of any kind have been furnished, without charge or at a nominal charge, directly or indirectly, as an inducement to the broadcast of such program.

Disclosure to station of payments

"(b) In any case where a report has been made to a radio station, as required by section 508 of this title, of circumstances which would have required an announcement under this section had the consideration been received by such radio station, an appropriate announcement shall be made by such radio station.

Acquiring information from station employees

"(c) The licensee of each radio station shall exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any program or program matter for broadcast, information to enable such licensee to make the announcement required by this section.

Waiver of announcement

"(d) The Commission may waive the requirement of an announcement as provided in this section in any case or class of cases with respect to which it determines that the public interest, convenience, or necessity does not require the broadcasting of such announcement.

Rules and regulations

"(e) The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section." 47 U.S.C. § 317.

Section 501 provides:
General penalty

"Any person who willfully and knowingly does or causes or suffers to be done any act, matter, or thing, in this chapter prohibited or declared to be unlawful, or who willfully and knowingly omits or fails to do any act, matter, or thing in this chapter required to be done, or willfully and knowingly causes or suffers such omission or failure, shall, upon conviction thereof, be punished for such offense, for which no penalty (other than a forfeiture) is provided in this chapter, by a fine of not more than $10,000 or by imprisonment for a term not exceeding one year, or both; except that any person, having been once convicted of an offense punishable under this section, who is subsequently convicted of violating any provision of this chapter punishable under this section, shall be punished by a fine of not more than $10,000 or by imprisonment for a term not exceeding two years or both." 47 U.S.C. § 501.

Section 502 provides:
Violation of rules, regulations, etc.

"Any person who willfully and knowingly violates any rule, regulation, restriction, or condition made or imposed by the Commission under authority of this chapter, or any rule, regulation, restriction, or condition made or imposed by any international radio or wire communications treaty or convention, or regulations annexed thereto, to which the United States is or may hereafter become a party, shall, in addition to any other penalties provided by law, be punished, upon conviction thereof, by a fine of not more than $500 for each and every day during which such offense occurs." 47 U.S.C. § 502.

Section 503 provides:
Forfeitures—Rebates and offsets

"(a) Any person who shall deliver messages for interstate or foreign transmission to any carrier, or for whom as sender or receiver, any such carrier shall transmit any interstate or foreign wire or radio communication, who shall knowingly by employee, agent, officer, or otherwise, directly or indirectly, by or through any means or device whatsoever, receive or accept from such common carrier any sum of money or any other valuable consideration as a rebate or offset against the regular charges for transmission of such messages as fixed by the schedules of charges provided for in this chapter, shall in addition to any other penalty provided by this chapter forfeit to the United States a sum of money three times the amount of money so received

or accepted and three times the value of any other consideration so received or accepted, to be ascertained by the trial court; and in the trial of said action all such rebates or other considerations so received or accepted for a period of six years prior to the commencement of the action, may be included therein, and the amount recovered shall be three times the total amount of money, or three times the total value of such consideration, so received or accepted, or both, as the case may be.

Violation of rules, regulations, etc.; notice of apparent liability; limitation of forfeiture liability

"(b)(1) Any licensee or permittee of a broadcast station who—

(A) willfully or repeatedly fails to operate such station substantially as set forth in his license or permit,

(B) willfully or repeatedly fails to observe any of the provisions of this chapter or of any rule or regulation of the Commission prescribed under authority of this chapter or under authority of any treaty ratified by the United States,

(C) fails to observe any final cease and desist order issued by the Commission,

(D) violates section 317(c) or section 509 (a)(4) of this title, or

(E) violates section 1304, 1343, or 1464 of Title 18, shall forfeit to the United States a sum not to exceed $1,000. Each day during which such violation occurs shall constitute a separate offense. Such forfeiture shall be in addition to any other penalty provided by this chapter.

"(2) No forfeiture liability under paragraph (1) of this subsection (b) shall attach unless a written notice of apparent liability shall have been issued by the Commission and such notice has been received by the licensee or permittee or the Commission shall have sent such notice by registered or certified mail to the last known address of the licensee or permittee. A licensee or permittee so notified shall be granted an opportunity to show in writing, within such reasonable period as the Commission shall by regulations prescribe, why he should not be held liable. A notice issued under this paragraph shall not be valid unless it sets forth the date, facts, and nature of the act or omission with which the licensee or permittee is charged and specifically identifies the particular provision or provisions of the law, rule, or regulation or the license, permit, or cease and desist order involved.

"(3) No forfeiture liability under paragraph (1) of this subsection (b) shall attach for any violation occurring more than one year prior to the date of issuance of the notice of apparent liability and in no event shall the forfeiture imposed for the acts or omissions set forth in any notice of apparent liability exceed $10,000." 47 U.S.C. § 503.

Section 508 provides:

Disclosure of payments to individuals connected wtih broadcasts—Payments to station employees

"(a) Subject to subsection (d) of this section, any employee of a radio station who accepts or agrees to accept from any person (other than such station), or any person (other than such station) who pays or agrees to pay such employee, any money, service or other valuable consideration for the broadcast of any matter over such station shall, in advance of such broadcast, disclose the fact of such acceptance or agreement to such station.

Production or preparation of programs

"(b) Subject to subsection (d) of this section, any person who, in connection with the production or preparation of any program or program matter which is intended for broadcasting over any radio station, accepts or agrees to accept, or pays or agrees to pay, any money, service or other valuable consideration for the inclusion of any matter as a part of such program or program matter, shall, in advance of such broadcast, disclose the fact of such acceptance or payment or agreement to the payee's employer, or to the person for whom such program or program matter is being produced, or to the licensee of such station over which such program is broadcast.

Supply of program or program matter

"(c) Subject to subsection (d) of this section, any person who supplies to any other person any program or program matter which is intended for broadcasting over any radio station shall, in advance of such broadcast, disclose to such other person any information of which he has knowledge, or which has been disclosed to him, as to any money, service or other valuable consideration which any person has paid or accepted, or has agreed to pay or accept, for the inclusion of any matter as a part of such program or program matter.

Waiver of announcements under section 317(d).

"(d) The provisions of this section requiring the disclosure of information shall not apply in any case where, because of a waiver made by the Commission under section 317(d) of this title, an announcement is not required to be made under section 317 of this title.

Announcement under section 317 as sufficient disclosure

"(e) The inclusion in the program of the announcement required by section 317 of this title shall constitute the disclosure required by this section.

Definition of service or other valuable consideration

"(f) The term service or other valuable consideration as used in this section shall not in-

no private right of action exists for alleged violations of the Act. For reasons stated herein, the motions for summary judgment are granted.

The sections of the Act concern certain disclosure and announcement requirements which a radio station has to make when payments are received for the broadcast of any matter over the station; penalty and forfeiture provisions, enforceable by the government and the F.C.C., are provided for violations of the Act. However, the Act provides no statutory basis for a private right of action; it was enacted for the benefit of the public interest in communications and did not fashion new private rights. *Scripps-Howard Radio, Inc. v. F.C.C.*, 316 U.S. 4, 14, 62 S.Ct. 875, 86 L.Ed. 1229 (1942).

The Act did not create, even by implication, a cause of action cognizable in the district courts, *Daly v. West Central Broadcasting Co.*, 201 F.Supp. 238, 240–41 (S.D.Ill.), *aff'd sub nom., Daly v. Columbia Broadcasting System, Inc.*, 309 F.2d 83 (7th Cir. 1962), the court's sole function being the review of final orders of the F.C.C., *Ackerman v. Columbia Broadcasting System, Inc.*, 301 F.Supp. 628, 631 (S.D.N.Y.1969), *after* the plaintiff has invoked the primary and exclusive jurisdiction of that commission, *Gordon v. National Broadcasting Co.*, 287 F.Supp. 452, 455 (S.D.N.Y.1968). The district courts have entertained original jurisdiction in actions brought by the government to exact a forfeiture or penalty, *see, e. g., United States v. Vega*, 447 F.2d 698 (2d Cir. 1971), *cert. denied*, 404 U.S. 1038, 92 S.Ct. 712, 30 L.Ed.2d 730 (1972); *United States v. Midwest Radio-Television, Inc.*, 249 F.Supp. 936 (D.Minn.1966); *United States v. WHAS, Inc.*, 253 F.Supp. 603 (W.D.Ky.1966), *aff'd*, 385 F.2d 784 (6th Cir. 1967), but have not done so in private suits, *see Daly, supra*, 309 F.2d at 85–86; *Gordon, supra*, 287 F.Supp. at 455; *Ackerman, supra*, 301 F.Supp. at 631–32.

The contention that a private civil cause of action arises under these sections by implication is meritless, since the statute, legislative history and relevant cases refute any claim that Congress intended to protect a "specific class," as opposed to protection for the public generally. *See* H.R.Rep.No. 2148, 86th Cong. 2d Sess. Appendix C, 2 United States Code Congressional and Administrative News at p. 3541 (1960); *Scripps-Howard, supra; Ackerman, supra; Gordon, supra; Daly, supra; Communist Party v. SACB*, 96 U.S. App.D.C. 66, 223 F.2d 531, 556 (1954), *rev'd on other grounds*, 351 U.S. 115, 76 S.Ct. 663, 100 L.Ed. 1003 (1956); *Noerr Motor Freight, Inc. v. Eastern Railroad Presidents Conference*, 155 F.Supp. 768, 828 (E.Pa.1957), *aff'd*, 273 F.2d 218 (3d Cir. 1959), *rev'd on other grounds*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *cf. Reitmeister v. Reitmeister*, 162 F.2d 691 (2d Cir. 1947).

Defendants are granted summary judgment dismissing the second amended complaint, with costs and disbursements of this action.

So ordered.

---

clude any service or property furnished without charge or at a nominal charge for use on, or in connection with, a broadcast, or for use on a program which is intended for broadcasting over any radio station, unless it is so furnished in consideration for an identification in such broadcast or in such program of any person, product, service, trademark, or brand name beyond an identification which is reasonably related to the use of such service or property in such broadcast or such program.

Penalties

"(g) Any person who violates any provision of this section shall, for each such violation, be fined not more than $10,000 or imprisoned not more than one year, or both." 47 U.S.C. § 508.